(850 P.2d 269)
No. 68,011 [1]

PASQUALE SANTANIELLO and JENNIE SANTANIELLO, *Appellees*, v.
CHERYL SANTANIELLO, *Appellant*.

Opinion filed December 11, 1992.

*Ronald W. Nelson*, of Overland Park, for appellant.

*Nancy M. Caviar*, of Berkowitz and Cook, of Kansas City, Missouri, for appellees.

Before BRAZIL, P.J., LARSON, J., and BILL D. ROBINSON, JR., District Judge, assigned.

BRAZIL, J.: Cheryl Santaniello (Cheryl) appeals the granting of grandparent visitation pursuant to K.S.A. 38-129 to Pasquale and Jennie Santaniello (the Santaniellos), claiming there was not substantial evidence to support the court's finding and the court erred

in not granting Cheryl attorney fees. We reverse and remand with directions.

There was little or no sworn testimony introduced at the hearing. The following facts, which are not in dispute, were garnered from statements of counsel at the hearing and as presented in counsels' briefs.

In early 1983, Cheryl and the Santaniellos' adult son, Gary, began living together in New York. Soon after, Cheryl became pregnant and a daughter was born. At the time of the birth, the two couples occupied and jointly owned the same house, although Gary and Cheryl only lived in the same house with the Santaniellos for two periods of approximately eight months each during the years 1984 to 1986.

Conflicts arose between Gary and Cheryl and the Santaniellos. Gary suffered from a heart condition and was often required to go into the hospital for surgery and heart treatment. Disputes arose between the families each time Gary went into the hospital; consequently, Cheryl would move in with her mother and sister during Gary's hospital stays.

Gary and Cheryl purchased their own home in 1986. Shortly after, Gary and Cheryl's second daughter was born. Gary Santaniello died in 1988.

After Gary's death, because of financial strain and the fact that some of her close family lived in Kansas, Cheryl moved her family from New York to Kansas. They have since resided in Johnson County, Kansas, with Cheryl's mother and sister.

There was evidence that the Santaniellos saw their grandchildren periodically until shortly after their father's death. There had been no visitation from shortly after the father's death to the date the petition was filed. The reason for the grandparents' lack of contact with the grandchildren was a result of a combination of factors, including distance, financial constraints upon Cheryl, and the fact that, whenever the children were around the Santaniellos, the grandmother would talk incessantly about Gary's death. When Cheryl left New York, she did not leave a forwarding address or telephone number with the Santaniellos. However, the Santaniellos' other children had that information.

Cheryl first contends the trial court erred in presuming that visitation was in the best interests of the children and further

presuming there was a substantial relationship between the San-
taniellos and the grandchildren. We agree.

K.S.A. 38-129(a) provides:

"The district court may grant the grandparents of an unmarried minor
child reasonable visitation rights to the child during the child's minority
upon a finding that the visitation rights would be in the child's best interests
and when a substantial relationship between the child and the grandparent
has been established."

It is clear that grandparent visitation should only be ordered if
visitation is found to be in the child's best interests and there is
a substantial grandparent-grandchild relationship in place. *In re
Adoption of J.M.U.,* 16 Kan. App. 2d 164, 167, 819 P.2d 1244,
*rev. denied* 250 Kan. 805 (1991); *Spradling v. Harris,* 13 Kan.
App. 2d 595, 599, 778 P.2d 365, *rev. denied* 245 Kan. 786 (1989).
It is obvious that both findings must be made by the district
court before visitation may be granted.

In the present case, the district court did not make the findings
required by statute. It fact, it presumed both statutory require-
ments were present. The court stated: "If we start out with the
proposition that grandparents are entitled to visitation, from there
on it looks to me the question is how much and how often, if
at all. Maybe there is some reason why there shouldn't be vis-
itation." Later in the hearing, the court continued:

"You know, I understand that there is some ill will between the parties,
and, candidly, I don't care about it. I guess I have some type of a philo-
sophical commitment or belief that it's nice if children know who their
grandparents are and at least on occasion see their grandparents. And maybe
in some time in the past this grandmother didn't want to keep the children
or whatever. I don't care if that's true or not. Even if it is, if we don't let
them see her now, who are we hurting? Her or the children?"

Neither Cheryl nor the grandmother testified at the hearing.
No mental health professionals testified concerning the effect
grandparent visitation would have on the children. As stated pre-
viously, the hearing consisted of statements by the parties' re-
spective counsel. The roles of Cheryl and the grandmother in
the proceedings were reduced to interjecting comments through-
out the proceedings. In summary, the district court started with
the presumption that the grandparents were entitled to visitation

and then proceeded to negotiate with counsel to make the visitation arrangements.

In discussing future visits, the district judge stated: "I can get ahold of situations pretty quickly, and, frankly, I have custody and visitation cases kind of pigeon-holed as far as results. If it's this type of case, you get this kind of result." While the court may have custody and visitation cases "pigeon-holed," that does not relieve it of making the required findings under the statute. An examination of the record shows the district court did not specifically state the facts upon which it based its decision to grant visitation.

In presuming the grandparents were entitled to visitation, the district court placed the burden of proof upon the mother to show that visitation was not in the children's best interests. The burden of proof is upon the grandparents to show that it is in the children's best interests. See 13 Kan. App. 2d at 596.

Cheryl contends the evidence was insufficient to establish a substantial relationship between the Santaniellos and their grandchildren pursuant to K.S.A. 38-129. As noted in the first issue, the trial court was erroneously predisposed to the rights of the grandparents. Consequently, neither Cheryl nor the grandmother testified and the evidence on this issue was neither specific nor extensive.

Because of the predisposition of the trial court and the limited evidence, we must reverse and remand this case to a different trial judge for an evidentiary hearing following the dictates of K.S.A. 38-129(a). Also, because we cannot determine what effect, if any, the judge's erroneous presumptions of law may have had on his allowance of fees and expenses, the hearing on remand should include a reconsideration of Cheryl's motion for attorney fees and expenses pursuant to K.S.A. 38-131.

Reversed and remanded with directions.