683 So.2d 666 (1996)
Robert William WARD, Appellant,
v.
Shirley F. DIBBLE, Appellee.
No. 95-2480.
District Court of Appeal of Florida, Fifth District.
December 6, 1996.
Gary G. Graham, Inverness, for Appellant.
Charles P. Vaughn, Inverness, for Appellee.
GRIFFIN, Judge.
Robert Ward ["the father"], a widower and the father of Tina Ward and Robert Ward, Jr. ["the children"], appeals an order of the circuit court awarding Shirley Dibble ["the grandmother"] visitation with his children. The father asserts that visitation was not shown to be in the best interests of the children, who are now 16 and 15 years old. The father also argues that the Florida statute[1] which authorizes the courts, upon petition, to order children to visit with their grandparents, over the objections of a parent, is unconstitutional.[2] On April 28, 1995, the grandmother filed a petition in the circuit court for an order allowing her specified visitation with the two minor children of her deceased daughter, Carol ("the mother"). At the hearing on the visitation petition, the father's counsel explained to the court that the father did not object to visitation by the grandmother at his home in Florida, but he did object to sending the children to the grandmother's home in New York, where they would also visit with other relatives *667 besides the grandmother. The grandmother's counsel responded, "[M]y client wants to have visitation, and other people would like to see the children. That is why she was requesting that it be taken to New York. These other people can't come to the house to say `hi'."
The evidence revealed that the grandmother and her husband[3] lived on a farm in midstate New York. She was retired, and most of their income was derived from his shearing sheep. The father and the mother, along with their children, formerly lived near the grandmother in New York. In 1986, the mother was killed in a car accident. Following this tragedy, the father and the children continued to live in New York until 1989, when the family moved to Florida. The father now works in Inverness.
There was no testimony concerning the grandmother's relationship with the children prior to the mother's death. She characterized her relationship with the children prior to their move to Florida as "fine." Once a year after their mother's death and before the move, the children would stay with the grandmother's family for a weekend. The grandmother stated that during that same period, the children were baby-sat at her house by her daughter Loretta. She explained that she still loved the children and wanted to visit with them. She testified, however, that she could not afford to travel to Florida to do so.
The grandmother acknowledged that she and the father had a poor relationship. The father testified that he did not want the children to go to New York with their grandmother because he was afraid that she would take them to live with her relatives in another state. He explained that, in 1983, he had been working as a truck driver and spent several days at a time away from home. He claimed that the mother was coaxed by her family into leaving him, and that she took the children and went to Florida without telling him. She stayed in Florida briefly, and then made her way to Montana, where she had relatives. Legal process instituted by the father returned the mother and the children to New York some five months after their disappearance. The father testified that during the incident the grandmother told him and his attorney that she would not allow the mother to bring the children back to New York.
The father also expressed concern over an incident in 1983 when he drove to the grandmother's property to look for his wife and the grandmother approached him with a gun. The grandmother testified that the mother did not want to see him. She admitted to carrying the weapon, but claimed that she pointed it only at the ground. Her attorney acknowledged to the court that she had threatened to shoot the father's tires.
The father explained that he raised the children alone during the nine years since the mother died. He testified that after his wife's death, he often asked the grandmother and her family to baby-sit the children, but they were always too busy to help. According to him, Loretta would watch the children only about once every other month.
The father declared that he did not like the grandmother's family and that he did not trust them. He believed that Elpha Dibble and Bruce Dibble were part of a group of people that took the children to Florida in 1983, and he did not want the children to see them. He also accused Becky Dibble, the children's maternal aunt, of instigating the visitation petition. According to the father, Becky visited Florida late in the summer of 1994, and a week before school orientation was to begin, she wanted to bring the children back with her to New York. The father would not allow her to do so; nor would he allow her to bring the children to an Orlando motel room with her boyfriend, to whom she was not married. Becky allegedly became upset and told the father that she and the grandmother would get a lawyer and sue him for custody of the children. The father testified that he wanted his children to have no contact with Becky Dibble.
During the five years since the father and the children moved to Florida, the grandmother saw the children once, when, apparently on vacation in Florida, the grandmother *668 and her husband twice stopped by and went to dinner with the father and the children. During those five years, she did not write them any letters but she claimed to have sent them three or four cards.
Each of the children testified. Tina, who was 14 at the time of the hearing, stated that she did not want to go to New York to see her grandmother; nor did she want to leave her family or friends. Tina explained that she did not know her grandmother, and that she would be unhappy to be 1300 miles away from her father. The court inquired of her relationship with her paternal grandparents, and Tina responded that her relationship with them was good. The court then asked if she would like to have a good relationship with her grandparents in New York, and Tina answered, "I guess." She stated that she would not object to her grandmother visiting her at her house in Florida.
Robert, Jr., who was 13 at the time of the hearing, testified that he did not want to go to New York and that he was involved with activities in Florida which he did not want to leave. He had friends in Florida and was on a bowling team, and with his sister he took care of two dogs at home. He too had no objection to his grandmother visiting him at home and he summarized that he "just did not want to" visit with his grandmother.
In the appealed order, the trial court found that "the children [were] not dramatically opposed to visitation with their Grandmother." The court also concluded that section 752.01 was constitutional and that visitation was in the best interests of the children. The order provided for an eight-day visit each summer in New York, phone contact every other day between the father and the children, and that transportation costs were to be paid by the grandmother. The order additionally provided that, with the grandmother present, the children could visit with other people during their stay, including other family members. Because there is no competent evidence that the ordered visitation is in the children's best interests, we reverse.
For several years, by statute, Florida law has authorized grandparents, under certain conditions, to commence an action in the circuit courts for visitation with their grandchildren. See § 752.01, Fla.Stat. (Supp. 1985). Certain triggering events confer grandparents standing to file a visitation petition, including the death of a parent. § 752.01(1)(a), Fla.Stat. (1993). The statute requires the trial judge to award "reasonable rights of visitation" to a grandparent with respect to a child when such is found to be in the child's best interests. Five specific factors and one catchall factor that the court is required to consider in making the best interests determination are enumerated in the statute:
(a) The willingness of the grandparent or grandparents to encourage a close relationship between the child and the parent or parents.
(b) The length and quality of the prior relationship between the child and the grandparent or grandparents.
(c) The preference of the child if the child is determined to be of sufficient maturity to express a preference.
(d) The mental and physical health of the child.
(e) The mental and physical health of the grandparent or grandparents.
(f) Such other factors as are necessary in the particular circumstances.
§ 752.01(2), Fla.Stat. (1993). The statute offers no guidance as to how these factors should be applied, and there is no requirement that any written findings be made by the trial judge.
The father urges that the decision that visitation with the grandmother in New York was in the children's best interests was not supported by substantial, competent evidence. Because determinations of a child's "best interests" are properly left to the sound discretion of a trial judge, see Dinkel v. Dinkel, 322 So.2d 22, 24 (Fla.1975); Pridgeon v. Pridgeon, 632 So.2d 257, 261 (Fla. 1st DCA 1994), the lower court's "best interests" decision must be affirmed unless this court finds the determination to be unsupported by substantial, competent evidence. See Dinkel, 322 So.2d at 24.
*669 We begin with the seemingly unremarkable conclusion that it was the grandmother who bore the burden of establishing by competent evidence that visitation with her was in the best interests of each of her grandchildren. See § 752.01(1); see also Weybright v. Puckett, 262 Ill.App.3d 605, 200 Ill.Dec. 18, 20, 635 N.E.2d 119, 121 (1994); Santaniello v. Santaniello, 18 Kan.App.2d 112, 850 P.2d 269, 271 (1992). The transcript reveals, however, that both the grandmother and the trial judge placed significant emphasis on the notion that chapter 752 is accompanied by a presumption that visitation between a grandparent and grandchild is in the child's best interests, which essentially shifted the burden to the father to justify his decision against visitation with the grandmother in New York and to produce evidence that the requested visitation would not be in the children's best interests.
The proceeding below began with the trial judge asking the father's attorney why the grandmother should not be allowed to visit the child. During Robert, Jr.'s testimony, the court inquired as to how he would be harmed by going to New York to see his grandmother, and when the grandmother was being questioned by the father's attorney concerning whether she would force the children to see relatives that they did not want to see, the following took place:
THE COURT: I am not predisposed to do anything. If there is some reason that I think that is sufficient why they shouldn't see a certain person, then I have no reservations in so ordering it.
[FATHER'S ATTORNEY]: Okay. Your Honor, at this point, I would justI want to make his legal position clear. His legal position is that he doesn't have to have a reason to say that his children don't have contact with anyone. He is the parent. You are a parent. You have a right, Judge, to tell anybody my childI don't want him to have contact with so and so. And no one, including the State of Florida, has the right to tell you, Your Honor, as a parent, that you have to have a reason to not want your children to be with someone.
[GRANDMOTHER'S ATTORNEY]: Your Honor
THE COURT: Yeah, you do, because grandparents are entitled to visitation rights.
The court thus made its position clear that the father must justify the denial of visitation with the grandmother. This was incorrect. This statute does not provide that a grandparent is entitled to visitation based solely upon his or her status as a grandparent. Although the courts of this state have opined that Florida's legislature has adopted a policy that visitation between grandparents and grandchildren is potentially beneficial, see, e.g., Griss v. Griss, 526 So.2d 697, 699-701 (Fla. 3d DCA) (Pearson, J., concurring), review dismissed, 531 So.2d 1353 (Fla.1988); Dixon v. Melton, 565 So.2d 1378, 1381 (Fla. 1st DCA 1990), the legislative policy is given effect through the adoption of the statute itself, with the result that grandparents[4] uniquely, not aunts, uncles, siblings, friends, next friends, or "psychological parents," qualify for visitation rights with a child not their own. As have other states that have construed similar statutes, we hold that there is no presumption that grandparents are entitled to visitation. See Weybright, 200 Ill. Dec. 18, 635 N.E.2d at 121 ("The overriding concern of the court in any custody or visitation decision is the best interest of the child. A grandparent whose child has died and who seeks visitation under this section must show that it is in the best interest of the grandchild that the visitation request be granted. We reject petitioner's argument that there is somehow a presumption that visitation is proper and the custodial parent must show visitation should be restricted."); Santaniello, 850 P.2d at 271 ("In presuming the grandparents were entitled to visitation, the district court placed the burden of proof upon the mother to show that visitation was not in the children's best interests. The burden of proof is on the grandparents to show that it is in the children's best interests."); Ridenour v. Ridenour, 120 N.M. 352, 901 P.2d 770, 774 (Ct.App.) ("[T]here is no presumed beneficial *670 relationship between grandparents and children; rather, visitation is appropriate only after grandparents have met one of the threshold factors ... and presented evidence to show, among other factors, that visitation is in the child's best interests."), cert. denied, 120 N.M. 68, 898 P.2d 120 (1995).[5] After reviewing this record, we can find no substantial competent evidence that the ordered visitation is in these children's best interests. In light of this conclusion, it is unnecessary for us to reach the father's constitutional challenges to the statute.[6]
REVERSED and REMANDED.
DAUKSCH and COBB, JJ., concur.
NOTES
[1] § 752.01(1), Florida Statutes (1993).
[2] The Florida Supreme Court has recently decided Beagle v. Beagle, 678 So.2d 1271 (Fla.1996), and has declared unconstitutional § 752.01(1)(e), which concerns grandparent visitation in the context of an intact parental marriage. The First District Court of Appeal had upheld the constitutionality of the statute relying substantially on its earlier decision in Sketo v. Brown, 559 So.2d 381 (Fla. 1st DCA 1990), which found that a grandparent visitation order did not violate a widowed mother's constitutional right to privacy. As does this case, Sketo involved § 752.01(1)(a) and the situation where one of the child's parents is deceased. From the standpoint of a parent's fundamental right to raise his or her children, Beagle, at 1276, the distinction between an intact marriage where one parent objects to visitation and a case where one parent has died and the surviving parent objects to visitation is hard to discern. The First District Court argued in Beagle that they should be treated the same. Judge Webster, who concurred in Beagle, evidently saw no distinction either, concluding that the Beagle panel was bound by the court's earlier decision in Sketo. Judge Webster argued, however, that Sketo itself had been incorrectly decided and that § 752.01 unconstitutionally intrudes upon a parent's fundamental right to raise his or her child without governmental interference.
[3] It is not clear whether her husband was the children's natural grandfather.
[4] "Grandparent" is defined under the statute to include a great-grandparent. § 752.001, Fla.Stat. (1993).
[5] Cf. Steward v. Steward, 111 Nev. 295, 890 P.2d 777, 782 (1995) (construing grandparent visitation statute nearly identical to Florida's to embody a presumption against grandparent visitation when divorced parents with full legal rights to the children agree that it is not in the child's best interest to see its grandparents).
[6] Even though by 1993, every state in the nation had adopted a statute providing for grandparent visitation over the objection of a parent or parents, Cynthia L. Greene, Grandparents' Visitation Rights: Is the Tide Turning?, 12 J.Am.Acad.Matrim.L. 51, 52 & n. 3 (1994), constitutional challenges to these statutes have apparently just begun. In the context of the federal right to privacy and its protection of the fundamental right to raise a child without governmental interference, most courts that have addressed the issue have analyzed the visitation statutes with what appears to be only a rational basis scrutiny and have concluded that the statutes pass the constitutional challenge. Bailey v. Menzie, 542 N.E.2d 1015 (Ind.Ct.App. 1989); Spradling v. Harris, 13 Kan.App.2d 595, 778 P.2d 365 (1989); King v. King, 828 S.W.2d 630(Ky.), cert. denied, 506 U.S. 941, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992); R.T. v. J.E., 277 N.J.Super. 595, 650 A.2d 13 (Ch. Div.1994); People ex rel. Sibley v. Sheppard, 54 N.Y.2d 320, 445 N.Y.S.2d 420, 429 N.E.2d 1049 (1981); Dolman v. Dolman, 586 S.W.2d 606, 609 (Tex.Civ.App.1979); Campbell v. Campbell, 896 P.2d 635 (Utah.Ct.App.1995). One court applied an intermediate form of scrutiny in the fashion of the plurality opinion of Justices O'Connor, Kennedy and Souter in Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and, upholding the law, held that a statute does not impermissibly interfere with parents' constitutional rights unless the state substantially infringes upon the family relationship. Herndon v. Tuhey, 857 S.W.2d 203 (Mo.1993). Other courts have applied a strict scrutiny test and found visitation statutes to be narrowly drawn to effect the states' compelling interests in promoting grandparent-grandchild relationships. Sketo v. Brown, 559 So.2d 381 (Fla. 1st DCA 1990); Ridenour; Michael v. Hertzler, 900 P.2d 1144 (Wyo.1995). Also applying a strict scrutiny analysis, however, the Supreme Court of Georgia recently held Georgia's grandparent visitation statute to be unlawful under both the United States and the Georgia constitutions, finding insufficient evidence to sustain the notion that grandparental visitation always supported a child's health or welfare, and that, even assuming such benefits, the state cannot force visitation over the parents' objections without a showing that failing to do so would be harmful to the child. Brooks v. Parkerson, 265 Ga. 189, 454 S.E.2d 769(Ga.), cert. denied, ___ U.S. ___, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995). Similarly, after applying largely federal principles to the state constitution, the Tennessee Supreme Court, in Hawk v. Hawk, 855 S.W.2d 573 (Tenn.1993), held that Tennessee's grandparent visitation statute violated parents' constitutionally guaranteed right to raise their children without unwarranted state intervention because the state lacked a compelling interest in grandparent-grandchild visitation absent a showing that a substantial harm would otherwise threaten a child's health or welfare. More recently, the Tennessee court extended its analysis to terminate grandparent visitation after a child's mother and new adoptive father objected. Simmons v. Simmons, 900 S.W.2d 682 (Tenn. 1995).