No. 82,950

STATE OF KANSAS, DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, Petitioner in Paternity Action; and DANIELLE S., Individually and as Parent and Next Friend of S.D.S., a Minor Child, *Appellant*, v. JOSHUA J. PAILLET, (KENNY and COLLEEN PAILLET), *Appellees*.

(16 P.3d 962)

Opinion filed February 2, 2001.

*Grant D. Griffiths*, of Griffiths & Carroll, Chartered, of Clay Center, argued the cause and was on the briefs for appellant.

*Robert A. Thompson*, of Salina, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Kenny and Colleen Paillet are the grandparents of S.D.S., the minor child of Danielle S. and the Paillets' deceased son, Joshua J. Paillet. In the district court, the Paillets were granted visitation rights pursuant to K.S.A. 38-129 *et seq*. The Court of Appeals affirmed. *Kansas Dept. of SRS v. Paillet*, 27 Kan. App. 2d 295, 3 P.3d 568 (2000). We granted Danielle's petition for review.

S.D.S. was born March 5, 1997. In July 1997, the Kansas Department of Social and Rehabilitation Services (SRS) filed a petition on behalf of Danielle for a declaration of paternity and an order of support for S.D.S. Joshua Paillet voluntarily entered his appearance. In August 1997, a journal entry of judgment was filed finding that Joshua Paillet was the father of S.D.S. and ordering him to pay $150 per month for child support.

Joshua Paillet died in a motor vehicle accident on July 25, 1998. In October 1998, his parents, Kenny and Colleen Paillet, filed a petition pursuant to K.S.A. 38-129 *et seq*. to establish their rights as grandparents to visitation with S.D.S. K.S.A. 38-129(a) permits a trial court to order visitation for grandparents upon finding that visitation would be in the child's best interests and that there is a substantial relationship established between the child and the grandparents. The petition was filed under the original paternity suit caption, with Joshua named as respondent, although he was then deceased. Thus, we view the Paillets' petition as a petition to intervene.

A hearing was conducted on the Paillets' petition on January 12, 1999. The trial court concluded in its journal entry that "visitation by the paternal grandparents would be in the child's best interest and that a substantial relationship between the child and paternal

grandparents has been established." Visitation on the third weekend of each month was ordered, and a schedule was set out in the journal entry.

Danielle appealed from the judgment granting grandparent visitation rights to the Paillets. The Court of Appeals affirmed. Although the Court of Appeals reached the same result as the trial court, it took exception to the trial court's conclusion that a substantial relationship had been established between the child and the Paillets. 27 Kan. App. 2d at 297. The undisputed evidence was that there was no relationship between S.D.S. and her paternal grandparents.

Danielle S. and Joshua Paillet had been dating only briefly when she became pregnant. There seems to have been some initial question about the identity of S.D.S.'s father. Colleen Paillet testified that once it was established that Joshua was the father, he and Danielle had some conflicts about his paternal role. At some time, Danielle warned Joshua "that if he showed up on the place she would call the police on him." Approximately 6 months before he died, Joshua grew weary of trying to arrange with Danielle for visitation with S.D.S. At that time, Joshua's parents first contacted an attorney about visitation rights.

Shortly before Joshua died, Danielle's attorney wrote to the Paillets' attorney that the Paillets could visit S.D.S. in Danielle's home, but that no other visitation would be allowed. Colleen Paillet testified that she had not gone to Danielle's house to see S.D.S. during Joshua's lifetime because she was respecting "his wishes and his ability to handle it." She also testified that she did not go because she would not be welcome there.

Danielle testified that she sometimes took S.D.S. with her when she shopped at Gibson's, where Colleen Paillet worked part-time. Danielle faulted Colleen Paillet for ignoring them. Colleen Paillet conceded that she held back when she saw Danielle and S.D.S. at Gibson's and testified that she did so to avoid appearing to be pushy or demanding. She wanted Danielle to make the first move.

Danielle testified that she had seen bruises on Joshua Paillet that he told her resulted from his dad's beating him with the butt of a gun. Kenny Paillet denied that there was anything in his history or

background to indicate he would be a danger to S.D.S. He testified that he would not use physical force to discipline S.D.S. A school psychologist who had known Joshua testified that she had never had any suspicions of any kind of physical mistreatment in the Paillets' home. A registered nurse who is a 20-year friend of the Paillets testified that quite often they had small children in their house.

Danielle testified that S.D.S. was a very shy child and that she believed it would be traumatic for S.D.S. to be thrust into a strange environment, such as the Paillets' household. Danielle testified that she never left S.D.S. with anyone but her parents or family members. Colleen Paillet testified that she knew of two people outside Danielle's family who occasionally babysat for S.D.S.

The Court of Appeals did not agree with the trial court that the Paillets had a substantial relationship with S.D.S., but it affirmed the trial court by applying equitable principles of clean hands and estoppel. Stating that Danielle's testimony showed that she prevented the Paillets from having a relationship with their grandchild, the Court of Appeals invoked the equitable principal of unclean hands in its construction of the grandparent visitation statute. The Court of Appeals held:

"[W]here a parent is deceased and the other parent denies their child visitation with the parent or parents of the deceased parent, absent some compelling reason to the contrary, the statutory requirement of an existing substantial relationship between the grandparent and the child shall not be required before granting visitation rights to the grandparent." 27 Kan. App. 2d at 298-99.

The governing principles of the Court of Appeals' decision were stated as follows:

"In determining grandparent visitation, a trial court may not presume that grandparent visitation is in a child's best interests or that a substantial grandparent-grandchild relationship exists. The burden of proof is upon the grandparents to show such visitation is in the child's best interests."

"Where the grandparents of a child seek visitation with their grandchild and the parent continually and unreasonably denies visitation, the grandparents cannot be denied visitation for failure to have established a substantial relationship. Under such circumstances, a parent preventing grandparents from having meaningful contact with the child is estopped from claiming the grandparents do not

have any rights because of no substantial relationship." 27 Kan. App. 2d 295, Syl. ¶¶ 3 and 4.

Danielle's petition for review identified the issue as whether the trial court erred in finding that visitation would be in S.D.S.'s best interests and that S.D.S. had a substantial relationship with her paternal grandparents.

The Court of Appeals' opinion was issued March 31, 2000. Danielle's petition for review was filed on May 1, 2000.

On June 5, 2000, the United States Supreme Court issued its opinion in *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054. The legal basis for the Supreme Court's decision in *Troxel* is that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 530 U.S. at 66. Based upon that opinion, Danielle now asks this court to determine whether the application of K.S.A. 38-129 in the present case violates her constitutional due process right to decide the care, custody, and control of her daughter.

The general rule is that constitutional grounds asserted for the first time on appeal will not be considered by the appellate court. *Ruddick v. Boeing Co.*, 263 Kan. 494, 498, 949 P.2d 1132 (1997). This court has recognized three exceptions to the general rule. *State v. Conley* 270 Kan. 18, 30-31, 11 P.3d 1147 (2000), citing *Pierce v. Board of County Commissioners*, 200 Kan. 74, Syl. ¶ 3, 434 P.2d 858 (1967). One of those exceptions is where consideration of a question is necessary to serve the ends of justice or to prevent denial of fundamental rights. It is clear that this court's consideration of the due process question is appropriate in order to prevent denial of fundamental rights. Thus, we will review the application of K.S.A. 38-129 to appellant in light of the Supreme Court's decision in *Troxel*.

Counsel for the parties had an opportunity to file supplemental briefs in this court. Danielle's supplemental brief raised the question of due process. The Paillets' supplemental response brief addressed the procedural and substantive questions of consideration of the due process issue. Moreover, although stated as a sufficiency

of the evidence matter, the question stated by Danielle in her petition for review implicates the core issue from *Troxel:* Is the parent's fundamental right to direct her child's upbringing reflected in a presumption that she acts in the child's best interest?

Before addressing Danielle's due process claim, we need to dispose of the issues raised by Danielle in her petition for review and the argument the Paillets make—that Danielle asked the trial court to order visitation. As to the latter, the Paillets would have the court apply the invited error rule to extinguish Danielle's appeal. In its opinion the Court of Appeals stated:

> "The evidence at the hearing showed that there was a strained relationship between Danielle and the Paillets. Danielle repeatedly stated during the hearing that a relationship between S.D.S. and the Paillets should be fostered and encouraged. Notwithstanding this testimony, Danielle admitted that she had previously authorized her attorney to tell the Paillets she would not let them visit S.D.S. at any time." 27 Kan. App. 2d at 298.

The Court of Appeals summarized Danielle's testimony as showing that she prevented the Paillets "from having any relationship with their grandchild." 27 Kan. App. 2d at 298.

A review of the record confirms the accuracy of the Court of Appeals' view that Danielle's testimony and conduct were not always coincident. However, the record does not support the Paillets' assertion that appellant asked for what she got. In the trial court, Danielle stated that she would permit the Paillets to visit S.D.S. in her home. Upon the close of testimony, counsel for Danielle explained Danielle's position:

> "Your Honor, we certainly sympathize with the Paillets. This is an extremely touchy issue. It's very difficult to take our position under these circumstances, and we realize that, and we wouldn't be here if Miss [S.] didn't have very strong feelings about leaving her daughter unsupervised with them for weekends at a time or for extended time in the summer.
>
> . . . .
>
> " . . . The [Florida] Supreme Court [in *Von Eiff v. Azicri,* 720 So. 2d 510 (Fla. 1998)] invalidated a statute which mandated that the Court award grandparent visitation when one of the parents is deceased and the child is a minor child, and they recognize that a parent has a fundamental right to privacy in raising their children. However, we're not asking this Court to go that far. We're not saying, 'Deny them altogether.' We're just saying, take heed to what Miss [S.] is saying

that she's severely concerned about sending [S.D.S.] off for weekends at a time with people she has no relationship with, by their own admission.

"We feel it would be proper for—what we would prefer is that the parties work it out between themselves and that the grandparents visit with [S.D.S.] at Miss [S.'s] residence until a relationship has been established and [S.D.S.] feels comfortable around them. Our preference would be that there was no court involvement at all. . . . [W]e would ask that you refrain from ordering a visitation schedule at this time and simply prohibit Miss [S.] from keeping them from seeing [S.D.S.]. . . .

. . . .

"We would ask that the Court not set any type of schedule but simply prohibit Miss [S.] from denying visitation to the Paillets as long as Miss [S.] can be present, for the time being, until [S.D.S.] is able to grow older and feel more comfortable around the Paillets, and gives them a chance to establish a relationship with her."

The trial court's journal entry set a monthly visitation schedule that began in January 1999. The only concession to Danielle's request was that the first five visits, which were limited to 1 hour, were to be conducted in the child's home. The order also provided the Paillets would have visitation rights for Christmas Eve in odd-numbered years and Thanksgiving in even-numbered years.

We conclude that there is no substance to the Paillets' argument that Danielle's appeal is without merit in that the trial court ruled as she asked it to. The actual significance of Danielle's agreeing to permit the Paillets to visit S.D.S. in her home is that it shows that she, like Tommie Granville in *Troxel*, sought restrictions on visitation rather than a prohibition of it.

We next consider the issue raised by Danielle in her petition for review. K.S.A. 38-129 provides in pertinent part:

"(a) The district court may grant the grandparents of an unmarried minor child reasonable visitation rights to the child during the child's minority upon a finding that the visitation right would be in the child's best interests and when a substantial relationship between the child and the grandparent has been established.

"(b) The district court may grant the parents of a deceased person visitation rights. . . ."

Although the evidence in this case conclusively demonstrated that there was no relationship between the child and the petitioning grandparents, the trial court concluded that there was a substantial relationship between them and granted visitation rights. The Court of Appeals disagreed with the trial court's conclusion

that there was a substantial relationship between S.D.S. and the Paillets, but attributed the absence of a substantial relationship to Danielle's conduct, and declared that visitation rights could not be denied for lack of a substantial relationship. We disagree with the findings and conclusions of both courts.

Under K.S.A. 38-129, two conditions must exist before the district court can grant visitation to the Paillets. A substantial relationship must exist between the Paillets and their granddaughter, and the visitation must be in the best interests of the granddaughter. Danielle challenges the sufficiency of the evidence to support the district court findings that the two conditions exist in the present case. When such a challenge is made, we review the evidence in a light most favorable to the prevailing party below to determine if substantial evidence exists to support the trial court's findings. *York v. InTrust Bank, N.A.,* 265 Kan. 271, 289-90, 962 P.2d 405 (1998); *In re Adoption of F.A.R.,* 242 Kan. 231, Syl. ¶ 2, 747 P.2d 145 (1987). " 'Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issue can reasonably be resolved.' " *In re Estate of Reynolds,* 266 Kan. 449, 461, 970 P.2d 537 (1998) (quoting *Tucker v. Hugoton Energy Corp.* 253 Kan. 373, 377, 855 P.2d 929 [1993]).

As noted above, the evidence establishes that no relationship, let alone a substantial one, existed between the Paillets and their granddaughter. Danielle testified that neither she nor her daughter had any relationship with the Paillets. Colleen Paillet testified she never saw her granddaughter except at a distance. She never attempted to approach or see her and conceded that Danielle did not prevent her from doing so. She further testified she never sent her granddaughter presents or telephoned her. When asked on direct examination if she had a relationship with her granddaughter, she responded, "No. I'm afraid I don't." Clearly, the district court erred in finding that a substantial relationship existed between the Paillets and their granddaughter.

The Court of Appeals found that there was no support in the record for the district court's findings, but nevertheless affirmed the district court's granting visitation rights to the Paillets. The

court did so by creating an exception to K.S.A. 38-129(a), based on its finding that Danielle prevented the Paillets from developing a substantial relationship with their granddaughter. The record does not support such a finding. As previously noted, the Paillets made no effort to see their granddaughter and conceded Danielle never kept them from seeing their granddaughter. The Court of Appeals' exception is based upon a finding which is not supported by the record.

We also find the Court of Appeals' interpretation of K.S.A. 38-129(a) to be faulty. Interpretation of a statute is a question of law, and our review is unlimited. *State v. Arculeo*, 261 Kan. 286, Syl. ¶ 1, 933 P.2d 122 (1997). The provisions of K.S.A. 38-129(a) are clear and unambiguous and do not provide for an exception to the requirement of finding the existence of a substantial relationship between the grandparents and grandchild. Clearly, the legislature, if it wanted to, could have included such an exception, but it did not do so. It is for the legislature and not the courts to "draft" an exception to the statute. The legislature has placed the burden upon the grandparents to establish that visitation is both in the best interests of the grandchild and that a substantial relationship exists between the grandparents and their grandchild. The Paillets failed to meet that burden, and the Court of Appeals erred in creating an exception based upon unclean hands and estoppel.

We now turn to the constitutionality of K.S.A. 38-129. In *Troxel*, the Supreme Court affirmed the Washington Supreme Court's decision reversing a trial court's visitation order under the state statute permitting any person to petition for visitation rights and authorizing courts to grant visitation rights "whenever 'visitation may serve the best interest of the child.' " 530 U.S. at 60. The trial court applied the statute to expand the Troxels' visitation rights to their granddaughters beyond what their mother, Tommie Granville, would have permitted. After the Troxels' son, Brad, the father of the girls, ended his relationship with Granville in June 1991, he lived with his parents and regularly brought his daughters to his parents' home for weekend visitation. In May 1993, Brad committed suicide. The Troxels continued to see their grandchildren regularly until October 1993, when Granville limited the visits to one

short visit per month. The Troxels' petition for more visitation time was granted, and Granville appealed.

The Washington Supreme Court concluded that the Troxels could not obtain visitation rights to their grandchildren under the state statute. 137 Wash. 2d 1, 20-21, 969 P.2d 21 (1998). A majority of the court rested its decision on the federal Constitution, holding that § 26.10.160(3) unconstitutionally infringes on the fundamental right of parents to rear their children. See 137 Wash. 2d at 15-20. On certiorari, six justices of the United States Supreme Court affirmed the result reached by the Washington court; four justices joined in a plurality opinion that somewhat narrowed the Washington Supreme Court's reasoning.

The United States Supreme Court cited "extensive precedent" that unequivocally established that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 530 U.S. at 66. It held that the application of the Washington statute in the case unconstitutionally infringed on that fundamental parental right, but declined to consider "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." 530 U.S. at 73.

The Washington statute, according to the Supreme Court, was "breathtakingly broad." 530 U.S. at 67. It allowed any person to petition for visitation and allowed the court to grant visitation rights whenever visitation may serve the child's best interest. When given the opportunity to give the statute a narrow reading, the Court held, the Washington Supreme Court had declined to do so. 530 U.S. at 67. Hence, a parent's decision that visitation would not be in the child's best interest would be accorded no deference when a court considered a petition under the statute for visitation rights. 530 U.S. at 67.

The Supreme Court identified a combination of factors that demonstrated the unconstitutionality of the trial court's application of the statute. First, by presuming the grandparents' request should be granted in the absence of proof that it would not be in the children's best interest, it "directly contravened the traditional pre-

sumption that a fit parent will act in the best interest of his or her child." 530 U.S. at 69. The Supreme Court observed that a fit parent's decision must be accorded "at least some special weight." 530 U.S. at 70. Second, the trial court failed to give any weight to Granville's not opposing visitation. 530 U.S. at 71. The Supreme Court believed it significant that "many other States expressly provide by statute that courts may not award visitation unless a parent has denied (or unreasonably denied) visitation to the concerned third party. [Citations omitted.]" 530 U.S. at 71. Third, the reasons given by the trial court for awarding visitation to the Troxels were insubstantial. According to the Supreme Court,

"the Superior Court made only two formal findings in support of its visitation order. First, the Troxels 'are part of a large, central, loving family, all located in this area, and the [Troxels] can provide opportunities for the children in the areas of cousins and music.' (Record cite omitted.) Second, '[t]he children would be benefitted from spending quality time with the [Troxels], provided that that time is balanced with time with the childrens' [sic] nuclear family.' (Record cite omitted.)" 530 U.S. at 72.

To the Supreme Court, the combination of those three factors showed "that this case involves nothing more than a simple disagreement between the Washington Superior Court and Granville concerning her children's best interests." 530 U.S. at 72.

The plurality concluded:

"As we have explained, the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made. Neither the Washington nonparental visitation statute generally— which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted—nor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional." 530 U.S. at 72-3.

Justice Souter believed that the Washington Supreme Court invalidated the statute on its text rather than on its application. He would affirm on facial invalidity and go no further. 530 U.S. at 75. Justice Thomas "agree[d] with the plurality that this Court's recognition of a fundamental right of parents to direct the upbringing

of their children resolves this case." 530 U.S. at 80. In addition, he "would apply strict scrutiny to infringements of fundamental rights." 530 U.S. at 80.

Danielle concedes that the Kansas statute does not have the breathtaking breadth of the Washington statute. K.S.A. 38-129 authorizes a district court to grant visitation rights to grandparents only. She contends, however, that the application of 38-129 in this case is quite similar to application of the Washington statute in *Troxel*. We agree.

Noting the absence of any allegation that she is not a fit parent, Danielle contends that the trial court failed to give effect, as it must, to the presumption that, as a fit parent, she will act in the best interests of her child. Neither the trial court's ruling from the bench nor the journal entry reveals any consideration of Danielle's fitness as a parent—presumed or proved.

At the close of the hearing, the trial judge expressed his belief that there is a primal family bond that defies explanation. He acknowledged animosity between the parties, but expressed the belief that the primal bond was stronger and that the child inevitably would suffer from not having a relationship with her paternal grandparents. In other words, the trial judge concluded that his ordering visitation was in S.D.S.'s best interests. In the journal entry, the district court recited that upon review of the record it "finds and concludes that visitation by the paternal grandparents would be in the child's best interest and that a substantial relationship between the child and paternal grandparents has been established."

Two members of the Court of Appeals' panel noted that "the record on appeal does not reflect that the Paillets had a substantial relationship with S.D.S." 27 Kan. App. 2d at 297. The Court of Appeals eliminated the need for the Paillets to show a substantial relationship with their grandchild where her mother had prevented the formation of any relationship. See 27 Kan. App. 2d at 298-99. Although it noted in passing that the Court of Appeals in *Santaniello v. Santaniello*, 18 Kan. App. 2d 112, Syl. ¶ 2, 850 P.2d 269 (1992), held that a trial court may not presume that grandparent

visitation is in a child's best interests, the majority did not disturb the trial court's presumption in the present case. Senior Judge Paddock dissented. He reasoned that reversal was required by the holding in *Santaniello*. 27 Kan. App. 2d at 299-300.

In *Santaniello*, the trial court presumed that both statutory requirements were present. The Court of Appeals stated: "In presuming the grandparents were entitled to visitation, the district court placed the burden of proof upon the mother to show that visitation was not in the children's best interests. The burden of proof is upon the grandparents to show that it is in the children's best interests. [Citation omitted.]" 18 Kan. App. 2d at 115. Due to the trial court's erroneous predisposition to the rights of the grandparents, the Court of Appeals reversed and remanded the case to a different trial judge "for an evidentiary hearing following the dictates of K.S.A. 38-129(a)." 18 Kan. App. 2d at 115.

In *Santaniello*, the Court of Appeals held that it could not be presumed that grandparent visitation was in a child's best interests and placed the burden of proof on the grandparents. 18 Kan. App. 2d 112, Syl. ¶ 2. In the present case, the Court of Appeals stated the same general rules and created an exception for a circumstance where the parent unreasonably denied visitation. In effect, the exception shifts the burden of proof to the parent to show "some compelling reason" why the grandparents should not be granted visitation rights. 27 Kan. App. 2d at 298-99.

Application of K.S.A. 38-129(a) in *Santaniello* basically conforms to the due process requirements discussed in *Troxel*. The decisional framework of *Santaniello* conforms with *Troxel's* "traditional presumption that a fit parent will act in the best interest of his or her child." 530 U.S. at 69. It places the burden of proof squarely on the party seeking visitation rights to show that visitation would be in the child's best interests. Application of K.S.A. 38-129(a) in the present case conflicts with the due process requirements discussed in *Troxel*. The trial court made no presumption, as required by *Troxel*, that a fit parent will act in the best interests of his or her child. In this case, the operative presumption seems to have been that a fit parent would not have denied visitation, which jus-

tified the trial court's substituting its judgment in determining the child's best interests.

As Justice O'Connor observed in *Troxel*, the practical effect of such a presumption would be to allow the trial court to overturn any decision made by a fit custodial parent based solely on the judge's finding it would be in the child's best interests. O'Connor then added:

"In effect, the judge placed on Granville, the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters. . . .

"The decisional framework employed by the Superior court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child. See *Parham* [*v. J.R.*, 442 U.S. 584,] 602, 61 L. Ed. 2d 101, 99 S. Ct. 2493 [1979]. In that respect, the court's presumption failed to provide any protection for Granville's fundamental constitutional right to make decisions concerning the rearing of her own daughters. [Citations omitted.]" 530 U.S. at 69-70.

Likewise, the Court of Appeals implicates the presumption that a fit custodial parent makes decisions in the best interests of the child. It would allow a judge to call into question any parental decision which results in rejecting or limiting a grandparent's visitation. The Court of Appeals' decision essentially circumvents the presumption that a fit parent makes decisions in the best interests of his or her child. Such a decision would not allow a fit parent to limit a grandparent's visitation without losing the presumption that the parent is making the decision in the best interests of the child.

In *Troxel*, six members of the Supreme Court agreed that parents have a fundamental right to direct the upbringing of their children. In light of that agreement and the plurality's decision that a state visitation statute may not be applied so as to contravene a parent's substantive due process right to rear his or her children, the judgment of the district court and the Court of Appeals must be reversed.

Finally, Danielle asks that this case not be remanded to the district court. She argues that K.S.A. 38-129 is unconstitutional for not incorporating the presumptions that a fit parent will act in his or her child's best interests. She contends that, given the current language of the statute, remand would serve no purpose. We agree

that the case should not be remanded but not for the reason expressed by Danielle.

The Supreme Court in *Troxel* passed on holding whether "specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter." 530 U.S. at 73. Thus, we do not find K.S.A. 38-129 to be unconstitutional on its face but only in its application in the present case. K.S.A. 38-129 requires a finding of both the best interests of the child and a substantial relationship established with the grandparents. Neither requirement is called into question by the Supreme Court's decision in *Troxel*. However, since we have determined that the Paillets did not meet their burden of proof as to both requirements of the statute, it would serve no purpose to remand the matter to the district court.

The Court of Appeals' judgment affirming the district court is reversed, and the judgment of the district court is reversed.