(64 P.3d 434)
No. 88,081

STATE OF KANSAS *ex rel.* SECRETARY OF DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES and TAMARA PAGE, *Appellants*, v. JEFFREY A. DAVISON, *Respondent*, and ROBERT BLAKE and DEBBIE BLAKE, *Intervenors/Appellees*.

Opinion filed September 6, 2002.

*Christopher J. Vinduska,* of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, for appellants.

*Ted L. Peters,* of Wichita, for intervenors/appellees.

Before GREEN, P.J., WAHL, S.J., and JOHN J. BUKATY, JR., District Judge, assigned.

WAHL, J.: Tamara Page Moler appeals the district court's order granting maternal step grandfather Robert Blake and maternal grandmother Debbie Blake visitation with her children, M.R.P. and B.A.M.

Tamara is the natural mother of M.R.P., who was born on December 2, 1997. Jeff Davison is the father of M.R.P. He was ordered to pay child support and was granted visitation.

Tamara had B.A.M. in February 2000 and she married his father Shawn Moler in May 2000. Debbie Blake is the maternal grandmother of M.R.P. and B.A.M., and Robert Blake is their maternal step-grandfather. On July 16, 2001, the Blakes filed a motion requesting grandparent visitation with both M.R.P. and B.A.M.

At the hearing, Debbie testified that M.R.P. and Tamara lived with the Blakes for approximately 6 weeks after M.R.P. was born and Debbie babysat her almost every day for 2 years. Debbie produced numerous photographs and a videotape of the Blakes and M.R.P. at various occasions during the first 2 years of her life. Debbie testified that she began seeing less of M.R.P., "maybe once a week," after Tamara became pregnant with B.A.M. and got married. Debbie admitted that she had spent "[v]ery little" time with B.A.M., and he had stayed at her house on only one occasion.

Tamara estimated that B.A.M. had contact with Debbie on a total of four or five occasions.

Robert briefly testified that he was married to Debbie when M.R.P. was born, that he loved M.R.P. very much, and that he thought very highly of their relationship. He did not discuss his relationship with B.A.M.

Tamara testified that M.R.P. had a significant relationship with the Blakes, but it was not in her best interests to have visitation with them. Tamara explained that the Blakes smoked around M.R.P. despite her repeated requests for them to stop, and Debbie would belittle her authority by cursing and fighting with Tamara in front of M.R.P. M.R.P. would return home from visits unruly and referring to her stepfather by his first name. She explained that she tried to accommodate Debbie by allowing her to visit the children in her home or by asking Debbie to go shopping with them, but Debbie refused to take advantage of these offers.

At the hearing, Debbie admitted that she offered to give Jeff negative information about Tamara to assist him in obtaining more visitation time with M.R.P. Debbie testified that she did this because she was concerned about her grandchildren. She explained that Tamara and Shawn had been involved in an incident of domestic violence, and she also suspected child abuse based on an injury to M.R.P.'s ear and observed M.R.P. using inappropriate language and doing inappropriate things to her dolls.

Tamara admitted that there had been one incident of domestic abuse, but she explained that M.R.P.'s ear was injured by a goat at her paternal grandparents' farm. Tamara testified that Debbie was present at the pediatrician's office when M.R.P. was examined for her injury and was aware of what had happened.

When Tamara learned of Debbie's offer to Jeff, she felt that it was not in M.R.P.'s best interests to visit Debbie because she was willing to compromise M.R.P. and manipulate the situation to get back at Tamara. Debbie was subsequently arrested and charged with harassment by telephone for repeatedly calling Tamara's home and leaving a message that " '[t]his had better stop somewhere and somebody's going to get hurt.' "

Jeff testified that he had no objection to the Blakes seeing M.R.P. as long as it did not interfere with his visitation rights. Jeff admitted that he had never observed the Blakes parent M.R.P. so he could not say whether they did a good or bad job.

In closing argument, Tamara's counsel argued that under *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, 654, 16 P.3d 962 (2001), which interpreted *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000), Tamara was entitled to a presumption that a fit parent will act in the best interests of her child and that presumption must be given special weight. However, the district court distinguished this case from *Troxel*:

"The *Troxel* case that Mr. Vinduska mentioned was kind of an atomic bomb. It was dropped on grandparents . . . . It says that you have to assume that parents are going to make the right decision for their child. Boy, that, to some extent, cuts out grandparents to a large extent. In that case, however, the mother—the father was dead. The mother wanted to reduce the time the grandparents, who were the father's parents, spent with the children or child, from once a week to once a month. And the Supreme Court made a big point out of the fact that the parent was not cutting the grandparents out of the children's life, the parent was only reducing the time that grandparents would spend. And the Supreme Court affirmed what the parent wanted to do. I distinguish this case from *Troxel*, because here mother is saying that she's going to exclude the grandparents from the grandchildren's life. It's not a matter of just reducing it to once a month. So, I think that I can distinguish *Troxel*.

"This case can be distinguished from *Troxel*, again, because we have two living parents. In *Troxel* the father was dead. Here we have Mother saying, 'I'm going to exercise my discretion and not have my parents spend time with my children.' Then on the other hand we have Jeff saying that as long as it doesn't infringe on his time it's okay with him to be—it's okay with him if the Blakes have time with the children. I think that what the evidence has done is deviate enough from the *Troxel* case that I can do whatever I think is right in this case. I don't think I'm restricted by *Troxel*, from saying I have to rubber stamp any decision that Mother makes. I am going to find that the Blakes have a substantial attachment to [M.R.P.] and have been significant in her life. I'm going to hold that as far as [B.A.M.] is concerned the same would be true, except that it was prevented by the mother from happening. And we have a recent case, and I'm sure Mr. Vinduska has read it, that says that we don't have to jump that hurdle. If we find that the parent has prevented the grandparents from establishing a significant relationship with the grandchildren."

The court did not make any findings regarding Jeff or Tamara's parental fitness nor did it find that Tamara's position was unrea-

sonable. The court explained why it believed grandparent visitation was necessary:

"I want people and families to love each other. . . . But families have to stay together in order to be a family. You know, we've got the old adage that absence makes the heart grow fonder. I believe firmly that absence makes the heart grow fonder of somebody else. I think that grandchildren need grandparents, and I know grandparents need their grandchildren."

The court ordered the parties to meet with Shawn's father, Pastor Steve Moler, to work out a settlement, but they could not reach an agreement.

In the court's order, the district court first noted that Jeff consented to visitation with the Blakes so long as it did not interfere with his visitation privileges. The court found that they "have a substantial attachment with [M.R.P.] and would have had a substantial attachment with [B.A.M.] had his mother, Tamara Page Moler, not prevented such a relationship" and that it was in the best interests of M.R.P. and B.A.M. to have visitation with the Blakes. The district court granted the Blakes overnight visitation with M.R.P. and B.A.M. every other Monday.

Tamara argues the district court erred by interpreting K.S.A. 2001 Supp. 60-1616(b) and K.S.A. 38-129(a) to permit step-grandparents to be awarded visitation. The interpretation of a statute is a question of law over which this court has unlimited review. *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, 654, 16 P.3d 962 (2001).

K.S.A. 2001 Supp. 60-1616(b) provides: "Grandparents and stepparents may be granted visitation rights." K.S.A. 38-129(a) provides:

"The district court may grant the grandparents of an unmarried minor child reasonable visitation rights to the child during the child's minority upon a finding that the visitation rights would be in the child's best interests and when a substantial relationship between the child and the grandparent has been established."

Tamara contends these statutes should be strictly construed and should not be expanded to include a step-grandparent. To support her argument, Tamara relies primarily on *In re Hood*, 252 Kan. 689, 847 P.2d 1300 (1993), and *In re T.A.*, 30 Kan. App. 2d 30, 38 P.3d 140 (2001).

Although not interpreting the term "grandparent" in the statutes, *In re T.A.* provides guidance in holding that "[t]hird-party visitation is a creature of statute and in derogation of a parent's constitutional right to direct the upbringing of his or her children. Third-party visitation statutes must, therefore, be strictly construed." 30 Kan. App. 2d 30, Syl. ¶ 2.

In *In re Hood,* the Kansas Supreme Court held: "K.S.A. 38-129 does not grant standing to an unrelated third party who claims to be 'grandparent like.' " 252 Kan. at 692. The court concluded: "We will not create a new common-law right of third-party visitation. The legislature is the forum to entertain sociological and policy considerations bearing on the well-being of children in our state. Any expansion of visitation rights to unrelated third parties ought to originate with the legislature." 252 Kan. at 693-94.

*Sowers v. Tsamolias,* 262 Kan. 717, 941 P.2d 949 (1997), and *Skov v. Wicker,* 272 Kan. 240, 32 P.3d 1122 (2001), also provide guidance on this issue. In *Sowers,* the natural grandparents of a child sought visitation rights under K.S.A. 38-129 after the child had been adopted by foster parents. The natural grandparents were raising the sister of the child who had been adopted. The dismissal of their petition was affirmed on the ground that adoption created new grandparents as well as new parents, and the biological grandparents were no longer grandparents within the meaning of K.S.A. 38-129.

In *Skov,* the Kansas Supreme Court considered whether the term "grandparents" in K.S.A. 38-129(a) includes a great-grandparent. The court relied upon its precedent of strictly construing the term "grandparents" in *Hood* and *Sowers* in concluding that great-grandparents are not included within the term "grandparents." 272 Kan. at 249.

It is well established that the visitation statute should be strictly construed. The one word at issue in the statute is "grandparent," which is not statutorily defined. Webster's II New College Dictionary 485 (1995) defines "grandparent" as a "parent of one's mother or father." Giving the term "grandparent" its plain and ordinary meaning, the intent of the legislature is plain and unambiguous. The legislature intended to authorize visitation to the par-

ent of a child's father or mother. As such, the district court mis-
applied the law when it awarded grandparent visitation rights to a
step-grandparent, and Robert Blake's visitation award must be re-
versed.

Before grandparent visitation can be granted under K.S.A. 38-
129, it must be established that a substantial relationship exists
between the grandparents and the grandchildren, and the visitation
must be in the best interests of the grandchildren. *Paillet*, 270 Kan.
at 653. Tamara argues the district court erred in concluding the
first condition of this statute was met by finding the Blakes would
have had a "substantial attachment" with B.A.M. but for her in-
tervention. (We assume the trial court meant "substantial relation-
ship.")

In *Paillet*, the district court concluded that a substantial rela-
tionship existed between the child and the grandparents seeking
visitation despite the fact that the evidence conclusively demon-
strated that there was no relationship between the child and the
grandparents. The Court of Appeals disagreed with the district
court's conclusion that a substantial relationship existed between
them, but it affirmed the visitation by attributing the absence of a
substantial relationship to the mother's conduct. On appeal, the
Kansas Supreme Court reversed this court's application of equi-
table principles in granting grandparent visitation:

"The provisions of K.S.A. 38-129(a) are clear and unambiguous and do not provide
for an exception to the requirement of finding the existence of a substantial re-
lationship between the grandparents and grandchild. Clearly, the legislature, if it
wanted to, could have included such an exception, but it did not do so. It is for
the legislature and not the courts to 'draft' an exception to the statute. The leg-
islature has placed the burden upon the grandparents to establish that visitation
is both in the best interests of the grandchild and that a substantial relationship
exists between the grandparents and their grandchild. The Paillets failed to meet
that burden, and the Court of Appeals erred in creating an exception based upon
unclean hands and estoppel." 270 Kan. at 654.

In this case, the district court found the elements of the statute
were met by attributing the lack of a substantial relationship to the
mother. Under *Paillet*, this finding was clearly erroneous. Debbie
had the burden of establishing that a substantial relationship ex-

isted between herself and B.A.M.; however, she admitted that she had seen B.A.M. very little during his lifetime and had cared for him in her home on only one occasion. The district court erred in granting Debbie visitation with B.A.M. because the elements of K.S.A. 38-129(a) were not met.

Tamara argues the district court unconstitutionally applied K.S.A. 38-129(a) by failing to give material weight and deference to her position as a fit parent. She argues the district court deprived her of her due process right to make decisions regarding the care, custody, and control of her children.

The United States Supreme Court considered this issue in *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000). In *Troxel*, following the death of their son, the paternal grandparents sought increased visitation with their grandchildren under a Washington visitation statute permitting courts to grant visitation rights to any person at any time when it would serve the child's best interests. The grandparents sought 2 weekends per month and 2 weeks each summer, and the mother wished to limit their visitation to 1 day per month. The Washington Supreme Court found the statute unconstitutionally interfered with the fundamental right of parents to rear their children. The Supreme Court granted certiorari and affirmed, finding the statute was an unconstitutional infringement on the mother's fundamental right to make decisions concerning the care, custody, and control of her daughters.

In reaching this conclusion, the Supreme Court identified a combination of factors. First, the district court had presumed that the grandparents' request should be granted in the absence of proof that it would not be in the children's best interests, which directly contravened the traditional presumption that a fit parent will act in the best interests of his or her child. The Supreme Court observed that a fit parent's decision must be accorded "at least some special weight." 530 U.S. at 70.

Second, the district court had failed to give any consideration to the fact that the mother was not opposing visitation, as she had proposed a visitation schedule which was unacceptable to the grandparents. Finally, the district court's reasons for granting visitation—the children would have opportunities in the areas of cous-

ins and music and would benefit from spending quality time with the grandparents—were unsubstantial. 530 U.S. at 72.

Relying upon *Troxel*, the Kansas Supreme Court found that K.S.A. 38-129 is not unconstitutional on its face. *Paillet*, 270 Kan. at 660. The *Paillet* court found that the statute requires a finding that both the best interests of the child will be served, and a substantial relationship had been established with the grandparents, and neither requirement was called into question by the Supreme Court's decision in *Troxel*.

However, "[a] constitutional application of K.S.A. 38-129 requires the trial court to give material weight and deference to the position of a fit parent" as "[t]here is a fundamental presumption that a fit parent will act in the best interests of his or her child in determining visitation under K.S.A. 38-129 and that presumption must be given 'special weight.' " *In re T.A.*, 30 Kan. App. 2d at 34.

Tamara argues the district court failed to comply with the statute and case law because it made no finding regarding her fitness as a parent, nor did it give special weight or any consideration to the presumption that she was acting in the best interests of her children. Tamara's argument has merit.

A major problem in this case is that the district court did not make sufficient findings to determine whether it applied the statute constitutionally. First, the court did not make any findings regarding the fitness of M.R.P.'s parents, despite the fact that Debbie had raised allegations of domestic abuse and possible child abuse. In the absence of any findings, it is not possible to determine the weight to be afforded to the positions of the parents.

Second, even if we assume that the parents were fit, the district court did not find that Tamara's desire to stop the visitation was unreasonable as required by *In re T.A.* Although the court used Tamara's desire to stop all visitation as a distinguishing factor from *Troxel*, the court did not find that this desire was unreasonable. Our courts have not specifically defined "unreasonable," nor have they determined that a fit parent's desire to cut off visitation with a grandparent is always unreasonable. Thus, the district court improperly substituted its own judgment in place of Tamara's without making a finding of unreasonableness.

Finally, the district court made no findings giving any special weight to the wishes of the parents and was, in fact, ambiguous about whether it was obligated to do so. The district judge emphasized that *Troxel* was distinguishable from this case because the father in *Troxel* was deceased and the mother was merely seeking to reduce the amount of grandparent visitation, and the judge concluded that "what the evidence has done is deviate enough from the *Troxel* case that I can do whatever I think is right in this case. I don't think I'm restricted by *Troxel*, from saying I have to rubber stamp any decision that Mother makes."

The court seems to be saying that *Troxel* is inapplicable because the positions of the parents here cancel each other out. However, Jeff's position that he was not opposed to visitation stands in sharp contrast to Tamara's visitation experience and articulated reasons why it was in M.R.P.'s best interests to stop visitation with Debbie. It would be inequitable for the district court to afford the positions of these two parents equal weight in an attempt to render the fundamental presumption that a fit parent acts in the best interests of his or her child inapplicable. On remand, the district court must clarify its findings on this issue.

We must remand this case for further findings regarding the fitness of the parents, how much weight the district court gives to the parents' positions, and why it finds Tamara's position unreasonable so as to substitute its own judgment for that of the parent.

Reversed and remanded for further proceedings.