(128 P.3d 434)
No. 94,362

JUDY DAVIS, *Appellee,* v. CRAIG N. HEATH and CHARLENE S. HEATH, *Appellants.*

Opinion filed February 17, 2006.

*Janet S. Helsel,* of Wichita, for appellants.

*F.C. "Rick" Davis, II,* of Davis & Jack, L.L.C., of Wichita, for appellee.

Before HILL, P.J., GREENE, J., and BUKATY, S.J.

HILL, J.: Craig and Charlene Heath appeal the court-ordered reestablishment of grandparent visits between their daughter and son and Craig's mother, Judy Davis. The Heaths broke off all contact between their children and Davis after she advised social services, incorrectly, that their daughter may have been sexually abused. The Heaths claim that their decision to deny visitation, made as two fit parents in a continuing nuclear family, should be given absolute deference by the courts. Because our statute dealing with grandparent visitation makes no distinction between nuclear families and other types of families, we reject the Heaths' conten-

tion. If the legislature wanted to create such a preference, it could have done so.

Further, the Heaths argue that the trial court erred by granting visitation with Davis. Also, they contend the evidence did not support a finding that there was a substantial relationship between their son and his grandmother that would compel grandparent visitation. As our rules require, after reviewing the evidence in the light most favorable to the party prevailing below, we find no error by the court when it granted Davis visitation. In like manner, we approve the district court's treatment of both siblings similarly and together as a pair, despite the boy's younger age and necessarily more limited relationship with his grandmother. We affirm.

### Background Facts

Craig and Charlene Heath, married in August 1994, are the parents of B.H., a daughter born in August 2000, and C.H., a son born in December 2002. Charlene also has a son, W., from a previous marriage. Davis is Craig's mother and grandmother of B.H. and C.H. She is now married to Robert Davis, Craig's stepfather.

### Uneasy Relationship Between Mother and Grandmother

Testimony from the trial of this matter reveals that Charlene Heath has never experienced a welcoming relationship with her mother-in-law, Judy Davis, from the start of her marriage with Craig. Davis once told her that she knew that Craig should never have married her, that Craig was not happy, and that Charlene did not love Craig. From that point on, Charlene claimed she avoided Davis whenever possible. Davis admitted that she told Craig that she objected to his marriage to Charlene because Charlene was older than he and was divorced, and that she never saw Craig smile or be happy since the marriage.

### Relationship between Grandmother Davis and the Grandchildren

Davis testified that B.H. was 3 days old when she first visited her at Charlene and Craig's house. Afterwards, she visited B.H. once a week for several weeks to take pictures of B.H. These weekly visits stopped after Davis became ill. However, Davis tes-

tified that she visited B.H. nine times in 2000, including a Thanksgiving celebration at her farm. Davis did not recall Charlene or Craig expressing any concerns to her regarding her care of B.H. Davis testified that in 2001 she had 12 visits with B.H. and an additional 6 visits where she would sometimes play with B.H. Most of these visits took place at Charlene and Craig's house. She also testified that in 2001 she had telephone calls with B.H. and B.H. would laugh and giggle on the phone.

In 2002, Davis had six phone conversations with B.H. She stated that B.H. was able to talk in 2002 and that she knew her as "Granny." Davis had a nickname of "Bibby" for B.H. She and B.H. began using these nicknames when B.H. was between 2 and 3 years old. Then in 2003, Davis called Charlene and Craig approximately 18 to 20 times. During these calls, B.H. would speak to her for a few minutes. Davis did not speak to C.H. because he was too young. Davis testified that when B.H. was older, Davis would cook, paint, make paper dolls, draw, color, play ball, play dress up, and take tractor rides with B.H.

At the time of trial, Davis had not seen the children since a December 2003 incident described later. C.H. was 1 year old at that time. Charlene testified that Davis had very little contact with C.H. and felt that Davis was always more interested in B.H. than C.H. Charlene did not believe Davis had a substantial and meaningful relationship with C.H. While Charlene acknowledged that Davis' relationship with B.H. was different than her relationship with C.H., she also did not believe that Davis had a substantial relationship with B.H. Charlene simply does not believe it would be in B.H.'s or C.H.'s best interests to continue a relationship with Davis.

On the other hand, Davis testified that she visited C.H. when she visited B.H. She stated that during her visits, she mainly just held C.H. but also played with him some of the time. Davis also stated that while C.H. was originally intimidated by her glasses, he later would gurgle and laugh at her. Davis also testified that she would like to continue her relationship with B.H. and C.H.

Davis testified that Charlene and Craig asked her to watch W. frequently, including some overnight visits, starting when he was

5 years old. W. was 16 at the time of the trial in March 2005. W. is diagnosed as having ADHD and takes Ritalin. Davis testified that Charlene and Craig had neither complained about the way she looked after W., nor indicated a reluctance to have W. come to her house.

## Overnight Visit December 2003

According to the district court, the "straw that broke the camel's back" arose after an overnight visit of B.H. with Davis in December 2003. Davis stated that during the visit, B.H. complained about pain when she tried to have a bowel movement. Davis examined the child's vaginal area. She claimed that B.H.'s vaginal area was red and swollen. When she asked B.H. what happened, B.H. responded by stating, "[T.] took an orange plastic snake and poked me in my pee pee and my bum." B.H. has a cousin named [T.]. Davis testified that B.H. stated it hurt and that she could not go to the bathroom. Davis claimed that B.H. was restless for the remainder of the night. Davis told both parents the next morning, but they were not convinced that their daughter had been inappropriately touched.

After believing that the parents did not plan to seek any help for B.H., Davis called the parents several times and volunteered to pay for a doctor or psychologist to examine the girl. Davis believed B.H. had been traumatized and needed care. A couple of days after the sleep over, Davis called Social and Rehabilitation Services because she believed the parents were not going to seek help for B.H. Approximately 9 days after the visit, the parents took B.H. to see a family practitioner who found no evidence of trauma. Charlene sent this doctor's report to SRS, and she was never contacted again by social services.

Charlene claimed that even after the doctor found no evidence of abuse, Davis still claimed that B.H. needed counseling. Charlene testified that Davis believed B.H. needed counseling for lying. At the time of the trial, Davis testified that she was willing to put the December 2003 incident behind her and move forward with her relationship with B.H. She is now willing to accept at face value

the parents' assertion that B.H. does not need psychological counseling and that whatever trauma may have existed is gone.

## Conclusions of Court

The district court concluded that a substantial relationship existed between Judy Davis and B.H. before Craig and Charlene shut the door on them. The two clearly demonstrated mutual affection, and the relationship was good and positive for B.H. Because it was in B.H.'s best interests to continue this relationship, the court ordered monthly 4-hour visits.

Furthermore, the court decided that, due to C.H.'s young age, his relationship was more limited with his grandmother but was "developing." The court decided that it was appropriate to deal with siblings similarly and together as a pair when ruling on the motion for grandparent visitation. Therefore, despite the more limited relationship, visits between C.H and Davis should start again as well.

In this appeal, the parents claim that their decision to cut off visitation with their children's grandmother should be given absolute deference since they are two fit parents in a nuclear family. They also argue that the district court abused its discretion in granting Davis' petition requesting visitation with B.H. and C.H. Finally, the parents claim that substantial evidence did not exist showing that Davis had a substantial relationship with C.H. or that it would be in C.H.'s best interest to continue the relationship with her grandmother.

## Legal Standards

The statute that deals with grandparent visitation is K.S.A. 38-129. It succinctly states:

"(a) The district court may grant the grandparents of an unmarried minor child reasonable visitation rights to the child during the child's minority upon a finding that the visitation rights would be in the child's best interests and when a substantial relationship between the child and the grandparent has been established."

When reviewing a district court's decision regarding grandparent visitation, an appellate court should "review the evidence in a light most favorable to the prevailing party below to determine if sub-

stantial evidence exists to support the trial court's findings. [Citations omitted.] ' "Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issue can reasonably be resolved." ' [Citations omitted.]" *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, 653,16 P.3d 962 (2001).

A review of the law concerning these types of cases reveals several points. A grandparent has the burden to prove the elements of K.S.A. 38-129(a) that would then compel court-ordered visitation with a grandparent. *DeGraeve v. Holm*, 30 Kan. App. 2d 865, 867, 50 P.3d 509 (2002). In *Paillet*, the court interpreted the United States Supreme Court case *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000), as requiring a court to allow a presumption that a fit parent will act in the best interests of their child and requiring a court to give a fit parent's decision regarding grandparent visitation special weight. 270 Kan. at 655-56. The court in *Paillet* went on to find that K.S.A. 38-129 was not unconstitutional on its face but was unconstitutional as applied in that case since the district court's order failed to indicate that it considered the fitness of the parent or that the parent's decision was given special weight. 270 Kan. at 657-60.

While a court must consider the fitness of a parent when making a determination on grandparent visitation, the court is not required to find parental unfitness before allowing grandparent visitation under K.S.A. 38-129(a). *DeGraeve*, 30 Kan. App. 2d at 867. As stated in *DeGraeve*:

"There is a fundamental presumption that a fit parent will act in the best interests of his or her child in determining visitation under K.S.A. 38-129. However, a parent's determination of what is in the child's best interests is not always absolute; otherwise the parent could arbitrarily deny grandparent visitation without the grandparents having any recourse. [Citation omitted.]" 30 Kan. App. 2d at 867.

Also, in *In re T.A.*, 30 Kan. App. 2d 30, 35, 38 P.3d 140 (2001), the court stated: "The trial court should presume that a fit parent is acting in the best interests of the child and not substitute its judgment for the parent's, absent a finding of unreasonableness."

*Absolute Parental Preference*

In making this absolute preference argument to us, Craig and Charlene cite no case law but unsuccessfully attempt to persuade us with a law review article. In Carey, *Grandparent Visitation Rights In Kansas: A Review Of Troxel v. Granville*, 69 J.K.B.A. 14 (Oct. 2000), the author argues what the courts should do:

"Imagine the scenario of both parents who are married to each other deciding to deny access of their children to their grandparents for whatever reason. Under existing K.S.A. 38-129(a), grandparents have standing to sue the parents for visitation. Should the district court award visitation under these circumstances? *While the Troxel decision said nothing about court intervention in this type of case,* the fact that two fit parents in a nuclear family situation jointly make a decision regarding grandparent visitation should be given substantial, if not, absolute deference because of the family status. Therefore, the trial court should probably dismiss the grandparent's petition." (Emphasis added.) 69 J.K.B.A. at 18-19.

The parents contend that this case is a clear example of what the author envisioned.

The trouble with this argument is that it ignores the statute, K.S.A. 38-129(a), a law that does not make any distinction between nuclear families and other families. In *Paillet,* 270 Kan. at 652-54, the court refused to create an exception in K.S.A. 38-129(a) that would allow grandparent visitation when the lack of a substantial relationship was caused by the parents' refusal to allow visitation with the child. In making this determination, the court stated the statute is clear and unambiguous:

"The provisions of K.S.A. 38-129(a) are clear and unambiguous and do not provide for an exception to the requirement of finding the existence of a substantial relationship between the grandparents and grandchild. Clearly, the legislature, if it wanted to, could have included such an exception, but it did not do so. It is for the legislature and not the courts to 'draft' an exception to the statute." 270 Kan. at 654.

In regards to this case, the legislature, if it had intended to, could have chosen to treat certain families differently by drafting the statute differently. Since the legislature did not create an exception for nuclear families, this court will not "draft" one into the statute. Courts need not give absolute deference to the decision of two parents in a nuclear family to prohibit grandparent visitation.

Furthermore, we point out that when the district court correctly set forth the assumption that fit parents act in the best interests of their children and that their decision is given special weight, the court gave further credence to the assumption due to the nature of the family. Specifically, the court held:

"This court finds that Craig and Charlene are fit parents and that the law assumes they will act in the best interests of their children in determining visitation under K.S.A. 38-129 and this Court gives that presumption special weight. [Citation omitted.] This Court further notes this assumption is significant considering the fact that the [family is] an intact family."

Accordingly, while the district court did not give the parents' decision absolute deference, the court did give greater deference to the decision due to the nature of the family.

### No Error in Granting Grandparent Visitation

We now examine the record in the light most favorable to Davis, who prevailed below. The district court set out in its order that the parents were fit parents and acknowledged that their decision was to be given special weight. The court also found that the reasons the natural parents listed in support of their determination to cut off visitation between Davis and B.H. and C.H. were "unreasonable, arbitrary and punitive." The parents first argue that the district court erred in determining that their decision to cut off visitation with the grandmother was unreasonable.

In viewing this in the light most favorable to Davis, we conclude that substantial evidence does exist to support the district court's finding. The frequent visits, the telephone calls, and the nicknames were all persuasive evidence to the district court, and we will certainly not substitute our judgment for that of the trial court.

While the evidence clearly shows that hostility exists between Charlene and Davis, the evidence also shows that a substantial beneficial relationship existed between B.H. and the grandmother. We note that the parents do not appeal from the district court's findings that a substantial relationship existed between Davis and B.H. and that it would be in B.H.'s best interests to continue the relationship. The evidence in this case does not show that B.H. or C.H. were abused or harmed in any way by Davis' actions. Addi-

tionally, no evidence was presented that the hostility between Charlene and Davis was noticeable to B.H. or C.H. or somehow negatively affected them. Instead, the evidence shows that a productive relationship existed between the grandmother and the children. In fact, when the evidence is viewed in the light most favorable to Davis, substantial evidence exists showing that the decision to cut off visitation with the grandmother was unreasonable. Accordingly, the district court did not err.

### Lack of Relationship with C.H.

The parents claim that substantial evidence does not exist showing that Davis had a substantial relationship with C.H. or that it would be in C.H.'s best interest to continue the relationship with his grandmother. We employ the same standard of review.

The district court found that at the time of trial, no current relationship existed between Davis and C.H. But, K.S.A. 38-129(a) does not require a current relationship to be shown in order to grant grandparent visitation. See *State ex rel. Secretary of Dept. of SRS v. Strotkamp*, 30 Kan. App. 2d 1143, 1146-47, 55 P.3d 924 (2002), where it was held:

"There is no requirement in the statute that the relationship must exist at the time of the hearing or for any length of time whatsoever. We do not believe that the court should read the statute to create additional requirements where none exist. We hold that a finding a substantial relationship has existed between the grandparent and the grandchild in the past is sufficient to satisfy the statutory requirements."

While there is clearly sufficient evidence to show a substantial relationship between Davis and B.H., much less evidence exists showing that a substantial relationship existed between the grandmother and C.H. In its journal entry, the court characterized the evidence of the relationship between Davis and C.H. as a "limited" or "developing" relationship.

After finding that a "developing relationship" existed, the court stated: "Where siblings are at issue, it is generally appropriate to treat the siblings similarly and together in ruling on a motion for grandparent visitation under K.S.A. 38-129(a)." In support of this statement, the court cited *Spradling v. Harris*, 13 Kan. App. 2d

595, 778 P.2d 365, *rev. denied* 245 Kan. 786 (1989). In *Spradling*, the court found that it was in one child's best interests to not be treated differently than her siblings in a K.S.A. 38-129(a) action. 13 Kan. App. 2d at 600. The district court here decided C.H. should be treated no differently than B.H. under these circumstances. The need to treat children alike supplies additional weight to a district court's decision that a substantial relationship between a grandparent and grandchildren exists. Furthermore, the need to treat children similarly should be considered when deciding whether to continue a developing relationship between a very young child, such as the grandson here, and his or her grandmother. As an appellate court, we will not reweigh evidence under these circumstances.

In the present case, as in *Spradling*, the evidence showing the relationship between the grandmother and C.H. is limited. However, Davis testified that she was present when C.H. was taken home from the hospital after birth. She also testified that she had five or six visits with C.H. in 2003. Davis testified that she initially just held C.H., but she played with him more as he got older. She further testified that she believed C.H. knew who she was when she held him and that he eventually would giggle and laugh at her.

Since C.H. was only 1 year old when contact was cut off with Davis, it is difficult to determine what constitutes a substantial relationship. The needs and abilities of a 1-year-old and those of a 3-year-old to relate to anyone are vastly different. While the evidence supporting a finding that a substantial relationship existed is not overwhelming in this case, when the evidence is viewed in the light most favorable to Davis, there is sufficient evidence to support a finding that a substantial relationship existed. Accordingly, the district court did not err in finding that a substantial relationship existed between the grandmother and C.H.

More importantly, the district court also did not err in determining that it would be in C.H.'s best interests to continue the relationship with Davis. As the court found in *Spradling*, it is apparent that it is in C.H.'s best interests to be treated the same as B.H. Equal treatment of children that are similarly situated is a hallmark of our law concerning children. For example, K.S.A. 60-

1610(a)(5)(B) only allows siblings to be divided into separate residences after a divorce when the case is "exceptional." Furthermore, nothing about the evidence presented at trial shows that C.H. would not benefit from having a relationship with his grandmother. The concerns expressed by the parents about further grandparent visits are speculative.

After reviewing the evidence presented at trial, it appears Davis has had a nurturing and positive relationship with both B.H. and C.H. Thus, substantial evidence exists to support the district court's finding that B.H.'s and C.H.'s best interests would be served by allowing a relationship with their grandmother to continue.

Affirmed.