(155 P.3d 719)
No. 97,100

In the Matter of JAYDEN CREACH and COLLIN CREACH, Minor children. LINDA MASON REYNOLDS, *Appellee*, v. JARRED CREACH and RAYNA CREACH, *Appellants*.

Opinion filed April 6, 2007.

*Ross D. Alexander*, of Alexander & Casey, of Wichita, for appellants.

*Chad M. Renn*, of Cobean & Renn, of Wellington, for appellee.

Before BUSER, P.J., GREEN and MARQUARDT, JJ.

GREEN, J.: Jarred Creach and Rayna Creach, natural parents of Jayden Creach and Collin Creach, appeal from the trial court's judgment granting the paternal grandmother, Linda Mason Reynolds, visitation with their minor children. Jarred and Rayna argue that the trial court unconstitutionally granted Reynolds grandparent visitation with their children by failing to comply with the requirements of *Troxel v. Granville,* 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000). We determine that it is unclear whether the trial court used the *Troxel* presumption, and if it did, whether it gave deference to Jarred and Rayna's opinion on grandparent visitation. As a result, we reverse and remand to the trial court to apply the *Troxel* presumption that fit parents act in the best interests of their children and that their opinion on grandparent visitation should be given special weight. Moreover, the trial court shall explain whether it would have imposed the same grandparent visitation had it applied the *Troxel* presumption. If it would have not made the same visitation order, the trial court shall establish a new visitation order.

In June 2004, Jarred told Reynolds that he did not want her having any contact with his children. On March 31, 2006, Reynolds asked the trial court for grandparent visitation with Jayden, born on December 24, 1998, and Collin, born on September 19, 2003. Reynolds requested visitation with her grandchildren 1 weekend per month from Friday at 6 p.m. to Sunday at 6 p.m., 2 days during the Thanksgiving holiday, 3 days during the Christmas holiday, and

2 continuous weeks over the summer. The trial court conducted a hearing on Reynolds' petition.

The evidence regarding Reynolds' contact with her grandchildren after June 2004 was undisputed. Since June 2004, Reynolds had only seen her grandchildren twice. In one instance, the children and Reynolds attended a birthday party for Charlotte Mason, the children's paternal great-grandmother. In the second instance, Reynolds visited Mason when the children were at Mason's home.

The evidence regarding Reynolds' contact with her grandchildren before June 2004, however, was disputed. Jarred and Rayna testified that Reynolds had significant contact with Jayden but not Collin. According to Jarred, Reynolds saw Jayden 1 or 2 times a week while she lived in Wichita for 2 years, and the two had developed a grandparent and grandchild relationship. Reynolds testified that she lived in Wichita from 2000 to 2004 and saw Jayden once or twice a week and that he stayed the night dozens of times during this time period. Jarred testified that after Christmas 2003, Reynolds only saw the children once every 2 or 3 months. Rayna testified that Reynolds visited Collin 1 or 2 times a week until visitation was terminated when Collin was approximately 9 months old. According to Rayna, Collin never spent the night with Reynolds and does not know who she is.

All the parties agreed that Jarred's termination of Reynolds' right to visit her grandchildren was the result of an incident that occurred between Reynolds and Jarred on June 21, 2004. The parties, however, disagree about the facts underlying the incident. On this date, Reynolds gave Jarred a haircut on Mason's front porch. Afterwards, Jarred sat on his motorcycle, which was parked a few feet away from the porch. In the process of sweeping the hair off of the porch, Reynolds swept some of the hair, along with dust and rocks, onto Jarred's motorcycle. Jarred testified that he yelled at his mother to stop and "called her several things." Reynolds testified that Jarred called her a "stupid whore cunt." Reynolds further testified, "I stood there and looked at him a couple of seconds and then I deliberately swept it." According to Reynolds, Jarred began to walk towards her with his arms back and his chest stuck out, making contact with her and causing her to fall onto a porch swing.

Jarred, however, maintained that he only walked towards Reynolds and that she tripped without him touching her. As a result of this incident, Jarred was convicted of domestic violence after a trial in municipal court.

After the June 2004 incident, Jarred terminated any contact between his family and Reynolds. At the hearing, both Jarred and Rayna stated that they did not want their children having contact with Reynolds. Jarred testified that he did not want his children and Reynolds to have a relationship because Reynolds had caused "significant problems" for his family. Jarred also maintained that he did not agree with Reynolds' values and that he was concerned she would physically discipline his children. Both Jarred and Rayna did not want the children riding in a car with Reynolds because she suffered from seizures or blackouts. Jarred testified that the problem between him and Reynolds could be resolved if Reynolds told the truth about the June 2004 incident.

Reynolds contacted Jarred four times after the June 2004 incident to try to resolve their problems and resume contact with her grandchildren. Reynolds asserted that Jarred refused to allow her to see Jayden and Collin unless she had the domestic abuse conviction expunged from his record. Reynolds admitted that in 1985 she was diagnosed with temporal lobe seizures but maintained that she had not had a seizure in 20 years. Reynolds further testified that she had never physically disciplined Jayden or Collin.

At the end of the hearing, Jarred and Rayna's attorney told the trial court that when making its decision on grandparent visitation, it needed to consider the parents' due process right to raise their children. Although Jarred and Rayna opposed any grandparent visitation, they offered an alternative visitation plan that they believed was more reasonable than Reynolds' proposed plan.

The trial court concluded that a substantial relationship existed between Reynolds and her grandchildren and that it would be in the children's best interest to have contact with Reynolds. The court expressed concern that Jarred was "using the grandchildren . . . as a tool to get back at his mother." The court further stated, "I really haven't heard any good motives from any of the evidence as to why visitation was cut off to begin with." The trial

court granted Reynolds' request for visitation with her grandchildren. For the first 2 months of visitation, the trial court ordered one 8-hour day visit per month to be supervised by Rayna. The court stated that after the first 2 months of the visitation period, Reynolds' visitation with her grandchildren would be 2 weekend days per month, 2 days during the Thanksgiving holiday, 3 days during the Christmas holiday, and 2 continuous weeks during the month of July.

### Did the Trial Court Unconstitutionally Apply K.S.A. 38-129?

Jarred and Rayna argue that the trial court unconstitutionally granted Reynolds grandparent visitation with their children by failing to comply with the requirements of *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000). Jarred and Rayna make three specific allegations: (1) that the trial court erred in not making a finding as to their parental fitness; (2) that the trial court erred in not making a finding regarding the reasonableness of their opinion on grandparent visitation; and (3) that the trial court erred in not giving special weight to their position on grandparent visitation. Jarred and Rayna ask this court to make the necessary findings and enter an order of grandparent visitation rather than remand the case to the trial court.

Reynolds acknowledges that the trial court did not make a specific finding as to Jarred and Rayna's parental fitness. Reynolds argues that she never alleged to the trial court that Jarred and Rayna were unfit parents. Additionally, she argues that Kansas case law does not require a trial court to make a specific finding of parental fitness when ordering grandparent visitation. Reynolds also acknowledges that the trial court did not make specific findings regarding the special weight it gave to Jarred and Rayna's opinions on grandparent visitation. Reynolds, however, argues that the record indicates that the court did consider the parents' opinions and found their opinions unreasonable.

Although both parties set out a substantial evidence standard of review in their briefs, the question posed by Jarred and Rayna implicates a question of law: Was their fundamental due process right to make decisions concerning the care, custody, and control

of their children violated by the trial court's application of K.S.A. 38-129? Whether a party's due process rights were violated is a question of law, which this court reviews de novo. *Hemphill v. Kansas Dept. of Revenue,* 270 Kan. 83, 89, 11 P.3d 1165 (2000).

The United States Supreme Court issued its landmark opinion on grandparent visitation in *Troxel.* The legal basis for the Supreme Court's decision in *Troxel* is that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 530 U.S. at 66. In *Troxel,* following the death of their son, the paternal grandparents sought increased visitation with their grandchildren under a Washington visitation statute permitting courts to grant visitation rights to any person at any time when it would serve the child's best interests. The grandparents sought 2 weekends per month and 2 weeks each summer. The mother, however, wished to limit the grandparent's visitation to 1 day per month. The Washington Supreme Court found that the statute unconstitutionally interfered with the fundamental right of parents to rear their children. On appeal, the United States Supreme Court affirmed, finding the statute unconstitutionally infringed on the mother's fundamental right to make decisions concerning the care, custody, and control of her children. 530 U.S. at 60-63.

The United States Supreme Court identified a combination of factors that supported its decision. First, the Court stated that the trial court had directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child by presuming that the grandparents' request should be granted in the absence of proof that it would not be in the children's best interest. The United States Supreme Court observed that a fit parent's decision must be accorded "at least some special weight." 530 U.S. at 70. Next, the Court noted that the trial court had failed to give any consideration to the mother's proposed visitation schedule. Finally, the Court pointed out that the trial court's reasons for granting visitation were insubstantial. 530 U.S. at 68-72.

K.S.A. 38-129 governs grandparent visitation and succinctly states:

"(a) The district court may grant the grandparents of an unmarried minor child reasonable visitation rights to the child during the child's minority upon a finding that the visitation rights would be in the child's best interests and when a substantial relationship between the child and the grandparent has been established."

Before a trial court may grant grandparent visitation, K.S.A. 38-129 requires two conditions: that a substantial relationship must exist between the child and the grandparent and that the visitation will be in the best interests of the child. The burden of proof is on the grandparent to show that visitation is in the best interests of the child and that a substantial relationship exists between the child and the grandparent. *Kansas Dept. of SRS v. Paillet,* 270 Kan. 646, 653, 16 P.3d 962 (2001).

Relying on *Troxel,* our Supreme Court found that K.S.A. 38-129 is not unconstitutional on its face. *Kansas Dept. of SRS v. Paillet,* 270 Kan. at 660. The *Paillet* court interpreted *Troxel* as requiring a court to presume that a fit parent will act in the best interests of his or her child and requiring a court to give a fit parent's decision regarding grandparent visitation special weight. 270 Kan. at 655-56. In *Paillet,* the court found that K.S.A. 38-129 was unconstitutionally applied in that case because the trial court's order failed to indicate that it had considered the fitness of the parent or that the parent's decision had been given special weight. 270 Kan. at 657-60. Simply put, "[a] constitutional application of K.S.A. 38-129 requires the trial court to give material weight and deference to the position of a fit parent. [Citation omitted.]" *In re T.A.,* 30 Kan. App. 2d 30, 35, 38 P.3d 140 (2001).

Jarred and Rayna argue that the trial court erred because it did not find them to be unfit parents. Although a court must consider the fitness of a parent when making a determination on grandparent visitation, the court is not required to find parental unfitness before allowing grandparent visitation under K.S.A. 38-129(a). *DeGraeve v. Holm,* 30 Kan. App. 2d 865, 867, 50 P.3d 509 (2002). Still, in her brief, Reynolds acknowledges that she never alleged to the trial court that Jarred and Rayna were unfit parents. Moreover, at the hearing, Reynolds' attorney told Rayna, "My client says you're a really, really, really good mother . . . ." Assuming Jarred and Rayna are fit parents, there is the fundamental presumption

from *Troxel* that they will act in the best interests of their children. Nevertheless, "a parent's determination of what is in the child's best interests is not always absolute; otherwise the parent could arbitrarily deny grandparent visitation without the grandparents having any recourse. [Citation omitted.]" 30 Kan. App. 2d at 867.

Additionally, this court has held that trial courts do not have to give absolute deference to a decision by two fit parents of a nuclear family who have jointly decided to deny a grandparent visitation with their children. *Davis v. Heath*, 35 Kan. App. 2d 86, 92, 128 P.3d 434 (2006). The *Davis* court affirmed the trial court's order of grandparent visitation, but only after it pointed out that the trial court had correctly recognized the presumption that fit parents act in the best interests of their children and that their opinion on grandparent visitation should be given special weight. 35 Kan. App. 2d at 93.

The record in this case does not show that the trial court gave Jarred and Rayna's opinions on grandparent visitation any special weight. The trial court seemed to merely find that the parents' initial decision to cut off visitation was unreasonable:

"You know, it appears to the court that Dad got upset over this incident. He didn't like being arrested and convicted. And he's using the grandchildren now as a tool to get back at his mother which certainly the court would not approve of. I really haven't heard any good motives from any of the evidence as to why visitation was cut off to begin with. Under the circumstances, I'll go ahead and approve the requested visitation."

Although Jarred and Rayna did not want Reynolds to have any visitation with their children, they also expressed concern to the trial court about the reasonableness of Reynolds' proposed visitation plan. At the conclusion of the hearing, Jarred and Rayna's attorney provided a proposed visitation plan:

"[T]he requested visitation is like one weekend short of what we grant a noncustodial parent. My—My clients, you know, if the court feels that some visitation must happen, they would request that the visitation be supervised by Rayna because at this point Collin doesn't even know Linda. They certainly request there be no overnight visitation. They would request—If the court feels that it should be ordered, they would request Sunday from 1:00 to 4:00 once a month supervised visitation. Nothing in the summer. The holidays are, you know, few and far be-

tween. That's for the parents. And there's other relatives these children need to see too."

Despite the parents' expressed concerns about visits over the holidays and visits lasting an entire weekend, the trial court did not give special weight to these concerns. The court's only apparent response to the parents' concerns was to order 8-hour monthly supervised visits for 2 months. Otherwise, the court granted grandmother's every visitation request without giving deference to the parents' opinions. In fact, the trial court did not make any findings regarding the reasonableness of the parents' proposed visitation plan. "Absent findings of unreasonableness, a trial court should adopt the grandparent visitation plan proposed by a fit parent." *In re T.A.*, 30 Kan. App. 2d at 35.

Here, the trial court did not make sufficient findings to allow this court to determine why the parents' proposed visitation plan was not adopted or why the grandmother's proposed visitation plan was not revised to address the parents' concerns. Because it is unclear whether the trial court applied the *Troxel* presumption, and if it did, whether it gave deference to Jarred and Rayna's opinions on grandparent visitation, it is impossible for this court to determine whether the trial court unconstitutionally applied K.S.A. 38-129 by interfering with Jarred and Rayna's due process right to parent their children.

Because this court does not weigh conflicting evidence or pass on the credibility of witnesses, Jarred and Rayna's request that this court make the necessary findings under *Troxel* and enter a visitation order is clearly inappropriate. See *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 775, 69 P.3d 1087 (2003). Therefore, we reverse and remand to the trial court to apply the *Troxel* presumption that fit parents act in the best interests of their children and that their opinions on grandparent visitation should be given special weight. Moreover, the trial court shall explain whether it would have imposed the same grandparent visitation had it clearly applied the *Troxel* presumption in this case.

If it would have not made the same visitation order, the trial court shall establish a new visitation order.

Reversed and remanded with instructions.