No. 114,756

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LINUS L. BAKER and AUSTIN BANKS,
(TERRI BAKER, RICK BANKS, and BRENDA BANKS),
*Appellants*,

v.

RYAN MCCORMICK,
*Appellee.*

SYLLABUS BY THE COURT

1.

The Kansas Protection from Abuse Act allows an adult "residing with a minor child" to seek orders of protection on behalf of that child. K.S.A. 2015 Supp. 60-3104(b). As a general rule, if the child is residing with that adult as of the filing date of the action, the district court has proper jurisdiction to consider the claim.

2.

Where a child has resided with an adult nonparent for some period of time before the filing of a Protection from Abuse Act claim and the child leaves that adult's residence after the action is filed and before a hearing is held, the court does not lose jurisdiction to consider the claim.

3.

Claims for grandparent-visitation rights may not be made in a Protection from Abuse Act case.

4.

On the facts of this case, the district court did not err when it determined that the plaintiffs had not demonstrated abuse with respect to one of the children.

Appeal from Johnson District Court; ROBERT J. WONNELL, judge. Opinion filed July 29, 2016. Affirmed in part, reversed in part, and remanded with directions.

*Linus L. Baker*, *Terri Baker*, *Austin Banks*, *Rick Banks*, and *Brenda Banks*, appellants pro se.

No appearance by appellee.

Before MALONE, C.J., LEBEN, J., and JOHNSON, S.J.

LEBEN, J.: The Kansas Protection from Abuse Act allows individuals to request court orders to protect victims of domestic violence. These proceedings—called "PFA" (Protection from Abuse) cases by judges and lawyers—must be heard quickly: a Kansas court can issue temporary orders for a limited time period but must hear the case within 21 days of filing unless the court approves a delay. Sadly, but also importantly, PFA cases are heard every day in the courts of Kansas.

The case now before us presents two legal questions that are specific to PFA cases. First, the Protection from Abuse Act allows either a parent or "an adult residing with a minor child" to seek protection orders on behalf of that child. K.S.A. 2015 Supp. 60-3104(b). In our case, a grandparent filed an action on behalf of two children while the children and their mother were living with the grandparent—but the mother disagreed with the filing and then moved out, taking the children with her. We must decide whether "an adult residing with a minor child" at the time of the filing can continue the action even if the child moves out of the adult's home before the hearing is held. Second, after the mother and children moved out—but before the PFA hearing—the grandparent brought a motion asking the court to order grandparent-visitation rights. Nothing in the

2

Protection from Abuse Act talks about grandparent visitation; we must decide whether such rights may be awarded in a PFA case.

We approach these questions with two important contextual guides. First, the Protection from Abuse Act tells us that its provisions "shall be liberally construed to promote the protection of victims of domestic violence . . . and to facilitate access to judicial protection for the victims." K.S.A. 60-3101(b). Second, each PFA case comes to the court with its own unique factual setting. We will summarize the factual setting of this case in the next section of our opinion.

FACTUAL AND PROCEDURAL BACKGROUND

The people whose rights are at the center of these proceedings are Charlie Banks, a 3-year-old girl at the time the PFA case was filed, and Sylas McCormick, then a 10-month-old boy. They are the children of Maggie McCormick and the grandchildren of Maggie's parents, Linus and Terri Baker. Also important to this story are the fathers of the two children, Austin Banks and Ryan McCormick, and the paternal grandparents of Charlie, Rick and Brenda Banks.

The PFA action now before us on appeal was filed on September 24, 2015, by Linus Baker and Austin Banks, as plaintiffs, against Ryan McCormick, the defendant. Linus and Austin filed a joint petition on behalf of Charlie and Sylas, alleging that Ryan had physically and verbally abused Maggie and had placed the children in fear of imminent bodily injury; as a result, Linus and Austin asked that orders of protection be entered against Ryan and to protect Charlie and Sylas.

Within days of the filing of the action, Maggie and her children moved out of her parents' home and went to live with Maggie's sister. In addition, before a hearing was held, Linus and Terri Baker filed a motion asking that the court provide specific times for

3

them, as grandparents, to visit with Charlie and Sylas. Rick and Brenda Banks filed a similar motion for visitation with Charlie.

The court held an evidentiary hearing on the petition on November 5, 2015. (The hearing took place more than 21 days after filing, apparently to allow additional time for the sheriff's office in Wyandotte County to locate and serve Ryan McCormick with the petition and notice of the hearing.) Ryan McCormick filed a written answer but did not attend the hearing; Linus Baker presented his own testimony along with testimony from Terri Baker, Maggie, and Austin.

The evidence demonstrated that Ryan had committed significant acts of abuse against Maggie, often with one or both children present. Photos admitted into evidence showed Maggie bloodied and bruised. One set of events took place on August 20, 2015, when Maggie tried to keep Ryan from driving while intoxicated. He pushed Maggie to the ground, causing a nosebleed. Ryan later pushed Maggie hard into a mirror, leaving the mirror broken and Maggie bleeding. (Austin testified that Charlie had told him about the mirror incident.) Ryan then threatened to kill himself while holding a knife to his stomach; Maggie said Charlie had heard these confrontations from another room. Maggie and her parents testified to many other incidents of abuse. On one occasion, Ryan pushed Maggie to the ground while she was holding Sylas, who bumped his head.

The evidence also showed that Maggie had left and then returned to Ryan more than once. After the August 20, 2015, incident, Maggie filed a petition for divorce and a PFA action, but she dismissed both in mid-September. It was after she dismissed those actions that Linus Baker and Austin Banks filed the PFA case now before us.

At the time this PFA case was filed, Maggie and her children were living with her parents. Maggie testified that she had moved out of her parents' house and gone to live with her sister on October 7, 2015; she said she had moved out because she had been mad

4

at her parents for interfering in the situation by filing the PFA case. Terri testified that Maggie and the children had initially moved in with Linus and Terri after a December 2014 domestic-violence incident but that Maggie had moved back to live with Ryan in May 2015. She moved back to her parents' home after the violence on August 20, 2015, and stayed until October 7.

The district court separately considered the claims of plaintiff Linus Baker, of plaintiff Austin Banks, and of the grandparents for visitation. The court also noted that Maggie was not a plaintiff in the action, having dismissed her own PFA case against Ryan.

As to Linus, the court apparently misunderstood part of the evidence about when Maggie and the children had lived with her parents. The court said that Maggie had disputed whether she lived with her parents at the time the petition was filed and cited testimony from Terri that Maggie had moved out in May 2015, well before Linus filed the PFA case in September. Based on that understanding of the testimony, the court said that Linus was not authorized to bring an action on behalf of the children because they did not reside with him as of the time the action was filed.

We can understand how the trial judge made this error. We have the benefit of a transcript; he heard the testimony once orally. At trial, Maggie said that one item in her written statement from September 2015—that Sylas lived with Linus and Terri—wasn't correct. But she was apparently indicating only that this was no longer true as of the November 5 hearing date. Maggie went on to agree in response to Linus' questions that she was residing with her parents in September 2015 because of Ryan's abuse, that she was residing there at the time Linus filed the PFA action, and that she moved out on October 7 because her parents had interfered in her affairs by filing the case. And while Terri did say that Maggie had moved out in May 2015 and returned to Ryan, she also said that the reconciliation "lasted maybe two months" before Maggie "came back for about

5

two weeks" and then moved to her sister's house. The evidence is clear that Maggie, Charlie, and Sylas were living with Linus and Terri Baker when the PFA action was filed but that they moved out on October 7, before the hearing held November 5, 2015. We will discuss the legal effect of that move in the next section of our opinion.

As to Austin, the court ruled that he had not met his burden to prove that Ryan had abused Charlie, Austin's daughter. The court noted that Maggie had not sought a protection order. Based on the lack of evidence of abuse against Charlie, the court declined to enter any orders of protection.

As to the grandparent-visitation issue, the court determined that such a request was not appropriate within a PFA case, especially since the child's mother, Maggie, was not a party. The court noted that parents have a fundamental constitutional right to make decisions regarding the care and custody of their children.

Linus, Austin, and all the grandparents have appealed these decisions to our court. They have filed an appellate brief; Ryan, who filed an answer but did not attend the district court hearing, did not file an appellate brief.

ANALYSIS

Our court must address three issues in this appeal. We noted two legal issues involving the Protection from Abuse Act at the beginning of the opinion: First, while an adult residing with a child can bring a PFA petition, can the PFA claim continue if the child no longer resides with that adult when the claim is heard? Second, can grandparents bring a claim for grandparent-visitation rights in a PFA proceeding? The third issue on appeal presents no novel legal issue: Austin and Linus simply argue that the district court got it wrong when it held that they had failed to prove that Ryan had abused Charlie. We will look at each of these issues in that order.

6

Before we do that, we would note that the joint appellate brief filed by Linus and Austin mentions only Sylas in its discussion of the first issue (whether Linus could bring a PFA action on Sylas' behalf). Elsewhere, however, the brief notes that Linus and Austin jointly filed the petition and jointly sought a protection order for Charlie as well. We have treated both children the same in our discussion of the first issue because the petition, filed jointly by Linus and Austin, sought relief on behalf of both children, and both children lived in the Baker home for the same time periods. Thus, Linus' ability to pursue a PFA action is at issue with respect to both children; we see no distinction between the legal status of Linus to bring a PFA action on behalf of one child as opposed to the other.

I. *The Court Erred When It Determined That the Minor Children Were Not Residing with Linus When He Filed the Action.*

When the right to make a claim comes from a statute, a court's subject-matter jurisdiction to consider the claim depends on meeting the terms set out in the statute. Whether a court has jurisdiction is a question of law, and we must review that question independently, without any required deference to the district court. See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009). Here, the question will be determined by the Protection from Abuse Act. Interpretation of a statute also presents a legal question that we review independently. *Ullery v. Othick*, 304 Kan. 405, 408, ___ P.3d ___, 2016 WL 1728774, at *3 (2016).

K.S.A. 2015 Supp. 60-3104(b) allows "an adult residing with a minor child" to file a petition on a minor child's behalf under the Protection from Abuse Act. The Act doesn't provide a definition of "residing with," and a number of alternative meanings might be available. As one court has noted, a related term, "residence," "is not a term of fixed legal definition but takes on shades of meaning according to the context in which it is found." *District of Columbia v. H.J.B.*, 359 A.2d 285, 290 (D.C. App. 1976). Another court

agreed, noting that while residence usually indicates a person's place of domicile, context is important, and a residence can also be quite temporary: "Sometimes it implies the place where a man temporarily resides, where he transacts business for a brief period." *Horton v. Horner*, 16 Ohio 145, 147, 1847 WL 24 (1847). Kansas statutes also recognize a flexible meaning for residence, with different definitions for, among other things, eligibility for appointment as a district judge, K.S.A. 20-331; eligibility for in-state tuition at state universities, K.S.A. 2015 Supp. 76-729; eligibility to attend elementary or secondary schools, K.S.A. 72-1046; and eligibility to vote, K.S.A. 25-407.

In addition to specific definitions found in statutes on specific subjects, the Kansas statutes also contain some generic definition provisions that apply when terms aren't otherwise defined; these generic provisions define the term "residence" but not the term "resides." Under the generic definition, found in K.S.A. 2015 Supp. 77-201 *Twenty-third*, "residence" means "the place which is adopted by a person as the person's place of habitation and to which, whenever the person is absent, the person has the intention of returning." But that definition isn't suited to the Protection from Abuse Act, which is to be liberally construed to allow access to the courts to protect domestic-violence victims. If we treated "residing with" consistent with K.S.A. 2015 Supp. 77-201 *Twenty-third*, a child who had come to live for a year or even more with a nonparent (such as an aunt, uncle, or grandparent) but planned to return to another more permanent residence would not have access to the courts through the adult with whom the child was then living on an extended basis in Kansas.

Like the noun "residence," the verb "resides" takes on meaning from context too. The last edition of Black's Law Dictionary to define the term gave many options—"Live, dwell, abide, sojourn, stay, remain, lodge"—and included concepts ranging from "to dwell permanently or continuously" to "to be stationed" and "to remain or stay." Black's Law Dictionary 1308 (6th ed. 1990).

8

Our task differs from the lexicographer's. We need not attempt to determine the meaning of "resides with" in every potential context—our job is to decide, on the facts of the case now before us, whether Linus had the authority to file a PFA action on behalf of his grandchildren because they resided with him at that time. On these facts, he did. Maggie and her children had been living with Linus and Terri from shortly after the domestic-violence incident of August 20, 2015, through the time Linus filed the PFA case on September 24, 2015. In addition, Maggie and her children had lived at the Baker residence from soon after the domestic-violence incident of December 2014 until May 2015, when Maggie decided to move back to Ryan's home. The facts we have noted are undisputed on the evidence, and based on those facts, we conclude that the children resided with Linus at the time he filed the PFA action, thus giving him the authority to do so.

Having decided that question, we must answer one more: Did Linus' authority to pursue the action end when Maggie and the children moved out and went to live with her sister? Again, we focus on the background considerations of the Protection from Abuse Act and its stated aim of making courts accessible for victims of domestic violence. In such cases, there are many potential reasons why someone might change residences, even several times, as individuals and families take precautions to be as safe as possible. The Act itself recognizes this possibility by providing that "[t]he right of a person to obtain relief under the protection from abuse act shall not be affected by the person's leaving the residence or household to avoid further abuse." K.S.A. 2015 Supp. 60-3103.

In our case, however, that specific provision doesn't seem to apply—Maggie didn't move with the children from her parents' home to her sister's "to avoid further abuse." She did so in reaction to what she perceived as interference in her life through Linus' filing of the PFA action itself.

With that provision not directly applicable, we have no explicit guidance in the Act about whether moving from the house of a nonparent the child is residing with *after* that nonparent files a PFA action on the child's behalf eliminates the court's jurisdiction over the case. Once again, though, we think that the Act's directive that we interpret its provisions to facilitate access to judicial protection provides sufficient guidance. The goal of the Act is to provide access to the court so that situations can be sorted out and appropriate orders of protection entered. That goal would be thwarted if moves by children while the action is pending—which could occur for any number of reasons— took away the court's jurisdiction to hear the case. Where, as here, the children resided with the adult who filed the action *at the time of filing*, that is sufficient to give the court jurisdiction to preside over the case to its natural conclusion.

This result is in line with cases that have applied a time-of-filing rule to determine a court's jurisdiction. Under that general rule, the court's jurisdiction is determined at the time of filing, not by later events. Linus and Austin cite a case in which our court applied the time-of-filing rule, *In re Adoption of I.H.H.-L.*, 45 Kan. App. 2d 684, 251 P.3d 651, *rev. denied* 292 Kan. 964 (2011). In that case, our court held that an adoption could not proceed when the parties who filed it failed to meet the statutory criteria to file it on the date they did so. 45 Kan. App. 2d at 690-91. Generally, when the court's jurisdiction depends upon the ability of a person or party to bring suit, the capacity of that person to do so is judged at the time of filing, *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570-72, 574-77, 124 S. Ct. 1920, 158 L. Ed. 2d 866 (2004), and later changes do not deprive the court of jurisdiction. 541 U.S. at 583-84 (Ginsburg, J, dissenting); *In re Guardianship of Sokol*, 40 Kan. App. 2d 57, Syl. ¶ 4, 189 P.3d 526 (2008). While there are caselaw and statutory exceptions to the time-of-filing rule, see *Grupo Dataflux*, 541 U.S. at 572-74; *Hill v. Kwan*, 2009 ME 4, ¶¶ 10-11, 962 A.2d 963 (Me. 2009); K.S.A. 2015 Supp. 77-614(c), the time-of-filing rule generally supports our view that changes taking place after filing shouldn't deprive the court of jurisdiction in a PFA case,

especially since we are to interpret the Protection from Abuse Act liberally to provide access to the courts to seek protection.

Even so, we recognize that the time-of-filing rule may not always be determinative under the Act since the Act specifically provides that leaving a residence to avoid further abuse doesn't eliminate a court's jurisdiction to hear the case. So if, for example, a child resided with the adult who filed a PFA action on the child's behalf until the day before the action was filed—but the child had moved to another location specifically to avoid abuse—the court would still have jurisdiction over the proceeding. In that situation, the legislature has provided for jurisdiction even though application of the typical time-of-filing rule would not recognize it. But the general rule is the time-of-filing rule, and Linus qualified under that rule.

In sum, the undisputed facts show that both children resided with Linus at the time the petition was filed. That gave the district court proper jurisdiction to consider the Protection from Abuse Act claims on their merits. The district court has not considered the claims involving Sylas on their merits, so we return the case to the district court for that purpose. As we discuss in the final section of our opinion, the district court did review the evidence of abuse against Charlie and found no abuse. Because the court did not indicate it had excluded any evidence from its consideration and we have found no error in its determination on the merits of the claim involving Charlie, we remand only the claim involving Sylas for further consideration.

Before we close this section of our opinion, we note that Maggie, the mother of these children, was not a party to this action. While Linus correctly notes in his appellate brief that a parent's views can still be presented even if the parent is a nonparty, there is no indication in the hearing held here that Maggie was advised that she could give the court her own views about the matters at issue rather than merely answering questions asked by Linus. (Austin and Linus, the two plaintiffs, each represented themselves at the

hearing, but Linus, who is a licensed attorney, called each witness and was the only person to ask questions of them.) Parents have a constitutional right to make the basic decisions involved in raising children, *Troxel v. Granville*, 530 U.S. 57, 66-68, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *Harrison v. Tauheed*, 292 Kan. 663, 678-79, 256 P.3d 851 (2011), so Maggie's views on any remedy would be entitled to consideration even if the district court concludes that Ryan has abused Sylas.

II. *The District Court Correctly Determined That an Action for Grandparent-Visitation Rights Is Not Properly Before the Court in a PFA Case.*

We turn next to the requests filed by two sets of grandparents for the district court to set aside specific times for them to have "substantial grandparent visitation" with the children. The district court determined that this was a matter not properly before the court in a PFA case. The question is a legal one to be determined by interpreting the Protection from Abuse Act; accordingly, we must consider the issue independently, without any required deference to the district court's ruling. *Ullery*, 304 Kan. at 408.

We begin by considering the provisions of the Protection from Abuse Act. K.S.A. 2015 Supp. 60-3107 sets out the types of orders that a court *may* grant if it finds abuse. Those orders include restraining orders, granting possession of a residence, ordering support payments, and "[a]warding temporary custody and residency and establishing temporary parenting time with regard to minor children." So the statute explicitly provides for temporary custody awards, temporary residence orders, and temporary *parenting* time—but it makes no mention of *grandparent*-visitation rights.

Even so, the grandparents argue that the court hearing a PFA case nonetheless must allow grandparents to seek visitation orders in that action based on K.S.A. 2015 Supp. 23-3301(a) and a case interpreting that statute, *In re T.N.Y.*, 51 Kan. App. 2d 956, 360 P.3d 433 (2015).

K.S.A. 2015 Supp. 23-3301(a) provides no support to grandparents—at least as it was enacted by the legislature. It states that grandparents and stepparents may be granted visitation rights, but it only provides that opportunity in divorce cases (which are covered in article 27 of chapter 23): "In an action under article 27 of chapter 23 of the Kansas Statutes Annotated, . . . grandparents and stepparents may be granted visitation rights." Moreover, since there was no common-law right to grandparent visitation, grandparents only have the visitation rights set out by statute. See *T.N.Y.*, 51 Kan. App. 2d at 960. So it would seem that the Protection from Abuse Act would not be an available forum for a motion or action to establish grandparent-visitation rights.

The grandparents argue that the *T.N.Y.* case changes this result. That case was a paternity action in which a father had petitioned to establish custody over his child, who had apparently been left for a substantial time period by the mother with her parents, the child's grandparents—but was with mother by the time the case was heard. The district court adopted paternity orders and a parenting plan submitted by the mother and father, and the grandparents filed for visitation rights. The district court denied their request because K.S.A. 2015 Supp. 23-3301(a) provided for grandparent visitation only in divorce cases and this was a paternity action.

Our court reversed, concluding that no legitimate state purpose would be served by allowing grandparent visitation in divorce actions but not in paternity cases; to do so would violate the equal-protection rights of the children, making a distinction between those who were born within a marriage and those who were not. To avoid that result, our court said that the opening phrase of K.S.A. 2015 Supp. 23-3301(a)—"In an action under article 27 of chapter 23 of the Kansas Statutes Annotated"—should be stricken. 51 Kan. App. 2d at 969.

Based on *T.N.Y.*, the grandparents argue that K.S.A. 2015 Supp. 23-3301(a) now applies to *all* types of actions that could involve child-custody and visitation matters. We disagree and conclude that the *T.N.Y.* case does not apply beyond its own setting—namely, a request for grandparent visitation within a *paternity* case.

The point of the *T.N.Y.* case was that if the State wanted to allow grandparent-visitation rights in divorce actions, with children born during a marriage, it must also allow grandparent-visitation rights in paternity actions, with children born out of wedlock. To do otherwise, the *T.N.Y.* court determined, would violate the equal-protection rights of children born out of wedlock to have their interest in grandparent visitation considered on an equal basis with children born during a marriage.

But that doesn't mean that grandparent-visitation rights must also be considered in cases brought under the Protection from Abuse Act. In accord with the *T.N.Y.* case, grandparents can already bring those claims in divorce cases or in paternity cases. Austin and Maggie weren't married when Charlie was born, and a paternity case already has established the rights of the parents and Austin's role as Charlie's father. So we presume that the grandparents could file a motion seeking grandparent-visitation rights in that action. Ryan and Maggie were married when Sylas was born, and they remain married with no divorce action on file, as far as our record shows. So there is no divorce or paternity action where the grandparents might file a grandparent-visitation claim regarding Sylas.

The *T.N.Y.* case does not suggest that creates a problem, however. Nothing in *T.N.Y.* suggests that there's an equal-protection problem in providing a legal way for grandparents to seek visitation rights when a family is not intact (as in a divorce or paternity action) and not providing that legal mechanism when a child was born to parents who were, and still are, married. After all, parents have the fundamental constitutional right to raise their children, and even in contested proceedings courts

14

presume that the parents' decisions on these matters are in the children's best interests. *Skov v. Wicker*, 272 Kan. 240, 248, 32 P.3d 1122 (2001); *In re Creach*, 37 Kan. App. 2d 613, 620, 155 P.3d 719 (2007); *In re Marriage of C.E.P.*, No. 113,411, 2016 WL 852917, at *8 (Kan. App. 2016) (unpublished opinion).

As we have discussed, the grandparents presumably could file a motion for visitation in the paternity case involving Charlie. As to Sylas, the Bakers, who seek visitation with Sylas (born during Ryan and Maggie's marriage), do not argue that there's an equal-protection problem in denying a forum for grandparent-visitation claims where a child is born during a marriage and no divorce action is pending. Instead, their argument is based on the court in the *T.N.Y.* case *striking* the introductory language that limited K.S.A. 2015 Supp. 22-3301(a) to divorce cases. Without that introductory language, they argue, the remainder of K.S.A. 2015 Supp. 22-3301(a) now applies to *all* types of actions that touch on child custody, including PFA cases.

We do not believe that the *T.N.Y.* case holding can be applied beyond its setting; it was a paternity case, not a PFA case. No one argued to the *T.N.Y.* court that grandparent-visitation rights could be grafted into PFA cases. So the *T.N.Y.* court's language about striking words from K.S.A. 2015 Supp. 22-3301(a) must be read within that context: When a grandparent files for visitation rights *in a paternity action*, the introductory clause of K.S.A. 2015 Supp. 22-3301(a) must be stricken so that the equal-protection rights of children are not violated. The same is not required—at least on the arguments presented to us—with respect to the interaction of K.S.A. 2015 Supp. 22-3301(a) and the Protection from Abuse Act.

With that foundational principle established, let's return to the statutory language our legislature has adopted. First, it specifically limited the ability to bring grandparent-visitation claims to divorce cases. That strongly suggests that the legislature did not intend such rights to be pursued in PFA cases. Second, the Protection from Abuse Act

makes no mention of grandparent-visitation rights. Third, the Protection from Abuse Act provides only for *temporary* custody orders—and the overall orders in PFA cases are all temporary, lasting up to 1 year in most cases with the option of a 1-year extension. K.S.A. 2015 Supp. 60-3107(a)(4) and (e).

So the direct statutory language suggests strongly to us that grandparent-visitation rights just aren't one of the topics available to be litigated in PFA cases. After all, grandparent-visitation rights didn't exist at common law, so the court's ability to hear such a claim depends on statutory authority. One other provision of the Protection from Abuse Act strongly supports this conclusion as well—the provision requiring that we construe the Act liberally so as to make the courts accessible for victims of domestic violence. See K.S.A. 60-3101(b).

To consider that, let's review how these cases must be handled in a busy Kansas trial court. Judges must keep sufficient time and judicial resources available to handle a steady stream of requests for temporary orders of protection. In addition, judges must set each of the cases for hearing within 21 days, unless one of the parties has a good reason for delay. And all of this must be done even if the judge has a 2-week murder trial or a lengthy medical-malpractice case on the calendar. So judges often set aside fixed times each week to handle PFA cases—but even so, they may not have much time to hear very important issues. In these circumstances, we should not lightly read the statutes to add *more* issues and *more* parties to the mix.

We conclude that grandparent-visitation issues are not properly before the court in a PFA case. In situations in which a grandparent qualifies as the adult who "resides with" a minor child and files the PFA action, of course, the court might well provide that the child should stay with the grandparent for the child's protection. And even in other cases, the court can determine custody and residential placement based on the child's need for protection. But in those cases, the grandparent's ability to spend time with the child is

16

simply a result of the needs of the child, not the request of the grandparent for visitation rights. We find no legal error in the district court's conclusion that the grandparents could not bring their motions for visitation time in a PFA case.

III. *The District Court Did Not Err When It Determined That Austin Had Not Proven That Ryan Abused Charlie.*

The district court concluded that Austin had not proven that Ryan had abused Charlie, a precondition for orders of protection. Austin and Linus challenge this conclusion. Although the district court referenced only Austin as the plaintiff with regard to Charlie, we note that Austin and Linus filed a joint petition, so we treat the claim as one brought by both Austin and Linus. There is no indication that the court excluded any of the evidence from its consideration, so failing to mention Linus as a plaintiff with respect to Charlie does not affect our review.

The district court specifically found that the plaintiffs had not sustained their burden to prove that Charlie had been abused as that term is defined in the Protection from Abuse Act. In a judge-tried case, when the court concludes that a party has failed to meet its burden of proof, we can only reverse the district court's factual determination if it arbitrarily disregarded undisputed evidence or was motivated by bias, passion, or prejudice. *Cresto v. Cresto*, 302 Kan. 820, 845, 358 P.3d 831 (2015); *Paida v. Leach*, 260 Kan. 292, Syl. ¶ 2, 917 P.2d 1342 (1996).

Having identified the standard that guides our review on appeal, we turn next to what Austin and Linus had to prove—abuse, as defined under the Protection from Abuse Act. The Act provides its own definition:

"As used in the protection from abuse act:

17

"(a) 'Abuse' means the occurrence of one or more of the following acts between intimate partners or household members:

(1) Intentionally attempting to cause bodily injury, or intentionally or recklessly causing bodily injury.

(2) Intentionally placing, by physical threat, another in fear of imminent bodily injury." K.S.A. 60-3102(a).

"Household members" includes those who have formerly resided together, K.S.A. 60-3102(b), so Ryan is covered with respect to Charlie. We look, then, to see whether Austin and Linus proved that Ryan had intentionally attempted to cause bodily injury to Charlie, intentionally or recklessly caused bodily injury to Charlie, or, by physical threat, intentionally placed Charlie in fear of imminent bodily injury.

There was no evidence that Ryan caused or attempted to cause physical injury to Charlie, and Austin and Linus don't make that claim on appeal. Rather, they argue that Ryan, by physical threat, intentionally placed Charlie in fear of imminent bodily injury. In support they argue that Charlie witnessed the events of August 20, 2015, when Ryan's actions left Maggie bloodied; Ryan and Maggie also struggled with each other while Ryan threatened to kill himself with a knife and Maggie tried to take the knife away. Austin and Linus argue that this left Charlie "not merely crying but screaming hysterically," thus showing that Ryan's physical actions had left Charlie in fear of imminent bodily injury.

We do not believe that is the only conclusion one can draw from the evidence. To summarize, there was no evidence that Charlie *saw* any of the events of August 20. Maggie testified that Charlie and her stepsister, Avery, were in a bedroom, where "they were crying because they could hear us fighting." In a written statement, also entered into evidence, Maggie said that Charlie and Avery had been in a bedroom when Ryan threw

18

Maggie into the mirror (in the living room) and that Charlie and Avery "heard that and started crying hysterically." There also was no evidence that Ryan ever attempted to strike or harm Charlie. Austin testified that Charlie was scared to be with Ryan, but his testimony related that to her concern about her mother, not herself: "Any time that Maggie has been residing with Ryan, Charlie will ask me if she can stay with me because she doesn't want to go back to Ryan's house, that she doesn't like being there, that Ryan's mean to her mom, and it makes her sad, and it scares her." With this evidence, we cannot say that the district court disregarded undisputed evidence when it concluded that Austin and Linus had not proven that Ryan, by physical threat, had placed Charlie in fear of imminent bodily injury.

In support of their position, Austin and Linus cite a case, *Crim v. Crim*, 40 Kan. App. 2d 367, 196 P.3d 375 (2008), that they contend allowed a PFA case to proceed with far less evidence than present here. We do not find the *Crim* case controlling. First, the issue in *Crim* was merely whether the *allegations* made in the PFA petition were sufficient to allow the case to proceed to a hearing, not whether a trial judge's conclusion that the evidence didn't show abuse should be reversed. Second, before the trial court's final ruling in *Crim*, the mother "withdrew the portion of the petition relating to the children because the parenting time and custody issues had been resolved the day before in the divorce proceeding." 40 Kan. App. 2d at 369. Thus, the court was *not* considering what allegations are sufficient to show abuse against a child; the plaintiff in *Crim* was the mother acting on her own behalf. The court began its discussion by noting that the mother maintained that her allegations showed that the defendant "willfully placed *her* in fear, by physical threat, of imminent bodily injury." (Emphasis added.) 40 Kan. App. 2d at 370. While the court later referenced threats of violence against both the mother and her children, its comments must be taken in the context of the issue presented—a claim of abuse brought, as of the trial court's final ruling, by the mother only on her own behalf, not on behalf of the children.

Finally, Austin and Linus argue that the district judge was biased against them, so the district court's factual findings should be reversed. In support, Austin and Linus argue that the district judge ignored undisputed testimony; may have been aware of an interaction between Linus and sheriff's deputies that could have placed Linus in a bad light; wouldn't allow Linus to question a witness by directly quoting profane language Ryan had used; and said at the end of the hearing that the court wished it could order everyone into counseling. We do not find that Austin and Linus have demonstrated bias on the part of the trial judge:

- While we did find that the district court misinterpreted the testimony about when Maggie and the children lived at the Bakers' home, we don't presume bias every time a factfinder makes a mistake about the facts. We see no evidence that the judge's factual error was motivated by bias, and we found no other instance in which the judge went against undisputed evidence.

- We have no evidence that indicates how much the judge knew—before the hearing—about Linus' interaction with sheriff's deputies. What we do know is that Linus presented a video of the interaction, a video that Linus suggested would explain what actually occurred. The record shows that the district judge viewed that video during the hearing. We note also that Linus did not complain before the hearing that the judge was biased against him or seek the judge's disqualification. See K.S.A. 20-311d. "[A] litigant who perceives a judge is biased against him or her should not be permitted to 'roll the dice' and wait for the outcome of the trial . . . ." *State v. Garcia*, No. 108,993, 2014 WL 1508623, at *3 (Kan. App. 2014) (unpublished opinion), *rev. denied* 301 Kan. 1049 (2015).

- It's true that the trial judge required that Linus use abbreviations or euphemisms rather than directly quoting profanities witnesses said Ryan had uttered. The district judge told Linus that he could "fully understand your meaning without that type of language," and we had no difficulty doing so, either. A trial judge has wide discretion in setting and enforcing rules of courtroom decorum, see *State v.*

20

*Rochelle*, 297 Kan. 32, 36, 298 P.3d 293 (2013), and its ruling that profanity need not be quoted directly in a judge-tried case did not show bias or prejudice.

- The judge's comment about a desire to send everyone to counseling may in some ways be problematic—judges have a duty generally to limit comments and rulings to what is reasonably required to resolve a case, while refraining from unnecessarily disparaging the people who come before them. *State v. Miller*, 274 Kan. 113, 128, 49 P.3d 458 (2002). One could certainly argue that it's generally inappropriate in a case involving domestic-violence allegations to suggest that everyone—victim, abuser, and interested parties alike—should go to counseling, especially when the only official action the court took was to find no proof of abuse and deny relief. Even so, the judge's comment, though unnecessary, didn't create reasonable doubt about the judge's impartiality. See *State v. Robinson*, 293 Kan. 1002, 1035, 270 P.3d 1183 (2012). We do not find the comment indicative of the sort of personal bias, prejudice, spite, or ill will concerning a party that would require disqualification of a judge or suggest that we should disregard the judge's factual findings on account of bias. 293 Kan. at 1032; *Paida*, 260 Kan. at 304.

The district court's judgment is reversed with respect to the court's jurisdiction to consider the claims Linus brought for orders of protection, and the case is remanded to the district court for further proceedings on the claims related to Sylas. The district court's judgment is otherwise affirmed.